C

Internal Revenue Service (I.R.S.)

Notice

# TAX-EXEMPT LEASING INVOLVING DEFEASANCE

Released: February 11, 2005

Published: February 28, 2005

Tax-exempt leasing involving defeasance. This notice disallows tax benefits claimed by taxpayers who enter into sale-in, lease-out (SILO) transactions and identifies SILOs as listed transactions.

The Internal Revenue Service and the Treasury Department are aware of types of transactions, described below, in which a taxpayer enters into a purported sale-lease-back arrangement with a tax-indifferent person in which substantially all of the tax-indifferent person's payment obligations are economically defeased and the taxpayer's risk of loss from a decline, and opportunity for profit from an increase, in the value of the leased property are limited. This notice alerts taxpayers and their representatives that these transactions are tax avoidance transactions and identifies these transactions, and substantially similar transactions, as listed transactions for purposes of § 1.6011-4(b)(2) of the Income Tax Regulations and §§ 6111 and 6112 of the Internal Revenue Code. This notice also alerts parties involved with these transactions of certain responsibilities that may arise from their involvement with these transactions.

## FACTS

X is a U.S. taxpayer. FP is a tax-in-different person that owns and uses certain property. [FN1] BK1, BK2, BK3, and BK4 are banks. None of these parties is related to any other party, unless otherwise indicated.

### Situation 1

On the closing date of January 1, 2003 ("Closing Date"), X and FP enter into a purported sale-leaseback transaction under which FP sells the property to X, and X immediately leases the property back to FP under a lease ("Lease"). The purchase and sale agreement and the Lease are nominally separate legal documents. Both agreements, however, are executed pursuant to a comprehensive participation agreement, which provides that the parties' rights and obligations under any of the agreements are not enforceable before the execution of all transaction documents.

The Lease requires FP to make rental payments over the term of the Lease ("Lease Term"). As described below, the Lease also provides that under certain conditions, X has the option ("Service Contract Option") to require FP to identify a party ("Service

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Recipient") willing to enter into a contract with X to receive services provided using the leased property ("Service Contract") that commences immediately after the expiration of the Lease Term. The Service Recipient must meet certain financial qualifications, including credit rating and net capital requirements, and provide defeasance or other credit support to satisfy certain of its obligations under the Service Contract. If FP cannot locate a qualified third party to enter into the Service Contract, FP or an affiliate of FP must enter into the Service Contract. The aggregate of the Lease Term plus the term of the Service Contract ("Service Contract Term") is less than 80 percent of the assumed remaining useful life of the property.

On the Closing Date, the property has a fair market value of $105x and X makes a single payment of $105x to FP. To fund the $105x payment, X provides $15x in equity and borrows $81x from BK1 and $9x from BK2. Both loans are nonrecourse and provide for payments during the Lease Term. Accrued but unpaid interest is capitalized as additional principal. As of the Closing Date, the documents reflect that the sum of the outstanding principal on the loans at any given time will be less than the projected fair market value of the property at that time. The amount and timing of the debt service payments closely match the amount and timing of the Lease payments due during the Lease Term.

FP intends to utilize only a small portion of the proceeds of the purported sale-leaseback for operational expenses or to finance or refinance the acquisition of new assets. Upon receiving the $105x purchase price payment, FP sets aside substantially all of the $105x to satisfy its lease obligations. FP deposits $81x with BK3 and $9x with BK4. BK3 may be an affiliate of BK1, and BK4 may be an affiliate of BK2. The deposits with BK3 and BK4 earn interest sufficient to fund FP's rent obligations as described below. BK3 pays annual amounts equal to 90 percent of FP's annual rent obligation under the Lease (that is, amounts sufficient to satisfy X's debt service obligation to BK1). Although FP directs BK3 to pay those amounts to BK1, the parties treat these amounts as having been paid from BK3 to FP, then from FP to X as rental payments, and finally from X to BK1 as debt service payments. In addition, FP pledges the deposit with BK3 to X as security for FP's obligations under the Lease, while X, in turn, pledges its interest in FP's pledge to BK1 as security for X's obligations under the loan from BK1. Similarly, BK4 pays annual amounts equal to 10 percent of FP's rent obligation under the Lease (that is, amounts sufficient to satisfy X's debt service obligation to BK2). Although FP directs BK4 to pay these amounts to BK2, the parties treat these amounts as having been paid from BK4 to FP, then from FP to X as rental payments, and finally from X to BK2 as debt service payments. Although FP's deposit with BK4 is not pledged, the parties expect that the amounts deposited with BK4 will remain available to pay the remaining 10 percent of FP's annual rent obligation under the Lease. FP may incur economic costs, such as an early withdrawal penalty, in accessing the BK4 deposit.

FP is not legally released from its rent obligations. X's exposure to the risk that FP will not make the rent payments, however, is substantially limited by the arrangements with BK3 and BK4. In the case of the loan from BK1, X's economic risk is remote due to the deposit arrangement with BK3. In the case of the loan from BK2, X's economic risk is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

substantially reduced through the deposit arrangement with BK4. X's obligation to make debt service payments on the loans from BK1 and BK2 is completely offset by X's right to receive Lease rentals from FP. As a result, neither bank bears a significant risk of nonpayment. [FN2]

FP has an option ("Purchase Option") to purchase the property from X on the last day of the Lease Term ("Exercise Date"). Exercise of the Purchase Option allows FP to repurchase the property for a fixed exercise price ("Exercise Price") that, on the Closing Date, exceeds the projected fair market value of the property on the Exercise Date. The Purchase Option price is sufficient to repay X's entire loan balances and X's initial equity investment plus provide X with a predetermined after-tax rate of return on its equity investment.

At the inception of the transaction, X requires FP to invest $9x of the $105x payment in highly rated debt securities ("Equity Collateral"), and to pledge the Equity Collateral to X to satisfy a portion of FP's obligations under the lease. [FN3] Although the Equity Collateral is pledged to X, it is not among the items of collateral pledged to BK1 or BK2 in support of the nonrecourse loans to X. The Equity Collateral upon maturity, when combined with the balance of the deposits made with BK3 and BK4 and the interest on those deposits, fully funds the amount due if FP exercises the Purchase Option. This arrangement ensures that FP is able to make the payment under the Purchase Option without an independent source of funds. Having economically defeased both its rental obligations under the Lease and its payment obligations under the Purchase Option, FP keeps the remaining $6x, subject to its obligation to pay the Termination Value (described below) upon the happening of certain events specified under the Lease.

If FP does not exercise the Purchase Option, X may elect to (1) take back the property, or (2) exercise the Service Contract Option and compel FP either to (a) identify a qualified Service Recipient, or (b) enter (or compel an affiliate of FP to enter) into the Service Contract as the Service Recipient for the Service Contract Term. If X exercises the Service Contract Option, the Service Recipient must pay X predetermined minimum capacity payments sufficient to provide X with a minimum after-tax rate of return on its equity investment. The Service Recipient also must reimburse X for X's operating and maintenance costs for providing the services.

As a practical matter, the Purchase Option and the Service Contract Option collar X's exposure to changes in the value of the property. If the value of the property is at least equal to the Purchase Option Exercise Price, FP likely will exercise the Purchase Option. Likewise, FP likely will exercise the Purchase Option if FP concludes that the costs of the Service Contract Option exceed the costs of the Purchase Option. Moreover, FP may exercise the Purchase Option even if the fair market value of the property is less than the Purchase Option Exercise Price because the Purchase Option is fully funded, and the excess of the Exercise Price over the projected value may not fully reflect the costs to FP of modifying, interrupting, or relocating its operations. If the Purchase Option is exercised, X will recover its equity investment plus a predetermined after-tax rate of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

return. Conversely, if the Purchase Option is not exercised, X may compel FP to locate a Service Recipient to enter into the Service Contract in return for payments sufficient to provide X with a minimum after-tax rate of return on its equity investment, regardless of the value of the property.

Throughout the Lease Term, X has several remedies in the event of a default by FP, including a right to (1) take possession of the property or (2) cause FP to pay X specified damages ("Termination Value"). Likewise, throughout the Service Contract Term, X has similar remedies in the event of a default by the Service Recipient. On the Closing Date, the amount of the Termination Value is slightly greater than the purchase price of the property. The Termination Value fluctuates over the Lease Term and Service Contract Term, but at all times is sufficient to repay X's entire loan balances and X's initial equity investment plus a predetermined after-tax rate of return. The BK3 deposit, the BK4 deposit and the Equity Collateral are available to satisfy the Termination Value during the Lease Term. If the sum of the deposits plus the Equity Collateral is less than the Termination Value, X may require FP to maintain a letter of credit. During the Service Contract Term, the Service Recipient will be required to provide defeasance or other credit support that would be available to satisfy the Termination Value. As a result, X in almost all events will recover its investment plus a pre-tax rate of return.

For tax purposes, X claims deductions for interest on the loans and for depreciation on the property. X does not include the optional Service Contract Term in the lease term for purposes of calculating the property's recovery period under §§ 168(g)(3)(A) and 168(i)(3). X includes in gross income the rents received on the Lease. If the Purchase Option is exercised, X also includes the Exercise Price in calculating its gain or loss realized on disposition of the property.

The form of the sale from FP to X may be a head lease for a term in excess of the assumed remaining useful life of the property and an option for X to purchase the property for a nominal amount at the conclusion of the head lease term. In some variations of this transaction, the participation agreement provides that if X refinances the nonrecourse loans, FP has a right to participate in the savings attributable to the reduced financing costs by allowing FP to renegotiate certain terms of the transaction, including the Lease rents and the Purchase Option price.

Situation 2

The facts are the same as in Situation 1 except for the following.

The Lease does not provide a Service Contract Option. In lieu of the Purchase Option described in Situation 1, FP has an option ("Early Termination Option") to purchase the property from X on the date ("ETO Exercise Date") that is 30 months before the end of the Lease Term. Exercise of the Early Termination Option allows FP to terminate the Lease and repurchase the property for a fixed exercise price ("ETO Exercise Price") that on the Closing Date, exceeds the projected fair market value of the property on the ETO Exercise

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Date. The Early Termination Option price is sufficient to repay X's entire loan balances and X's initial equity investment plus a predetermined after-tax rate of return on its equity investment. The balance of the Equity Collateral combined with the balance of the deposits made with BK3 and BK4 and the interest on those deposits fully fund the amount due under the Early Termination Option.

If FP does not exercise the Early Termination Option, FP is required to obtain residual value insurance for the benefit of X, pay rents for the remaining Lease Term, and return the property to X at the end of the Lease Term ("Return Option"). The residual value insurance must be issued by a third party having a specified minimum credit rating and must provide that if the actual residual value of the property is less than a fixed amount ("Residual Value Insurance Amount") at the end of the Lease Term, the insurer will pay X the shortfall. On the Closing Date, the Residual Value Insurance Amount is less than the projected fair market value of the property at the end of the Lease Term. If FP does not maintain the residual value insurance coverage for the entire Lease Term remaining after the ETO Exercise Date, FP will default and be obligated to pay X the Termination Value. If FP does not exercise the Early Termination Option, the rents for the remaining Lease Term plus the Residual Value Insurance Amount are sufficient to provide X with a minimum after-tax rate of return on the property, regardless of the value of the property. As a practical matter, the Early Termination Option and the Return Option collar X's exposure to changes in the value of the property. At the end of the Lease Term, FP also may have the option to purchase the property for the greater of its fair market value or the Residual Value Insurance Amount.

For tax purposes, X claims deductions for interest on the loans and for depreciation on the property. X treats a portion of the property as qualified technological equipment within the meaning of § 168(i)(2). X depreciates that portion of the property over five years under § 168(g)(3)(C). X treats a portion of the property as software. X depreciates that portion of the property over 36 months under § 167(f)(1)(A).

X includes in gross income the rents received on the Lease. If the Early Termination Option is exercised, X also includes the ETO Exercise Price in calculating its gain or loss realized on disposition of the property.

In some variations of this transaction, if the Early Termination Option is not exercised, the Lease rents payable to X may increase for the portion of the Lease Term remaining after the ETO Exercise Date.

ANALYSIS

The substance of a transaction, not its form, governs its tax treatment. Gregory v. Helvering, 293 U.S. 465 (1935). In Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978), the Supreme Court stated that "[i]n applying the doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed." The Court evaluated the substance of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

particular transaction in Frank Lyon to determine that it should be treated as a sale-leaseback rather than a financing arrangement. The Supreme Court described the transaction in Frank Lyon as "a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaning-less labels attached." Frank Lyon, 435 U.S. at 584. The Court subsequently relied on its approach in Frank Lyon to recharacterize a sale and repurchase of federal securities as a loan, finding that the economic realities of the transaction did not support the form chosen by the taxpayer. Nebraska Dep't of Revenue v. Loewenstein, 513 U.S. 123 (1994).

A sale-leaseback will not be respected unless the owner/lessor acquires and retains "significant and genuine attributes" of a traditional owner, including "the benefits and burdens of ownership." Coleman v. Commissioner, 16 F.3d 821, 826 (7th Cir. 1994) (citing Frank Lyon, 435 U.S. at 582-84). Considering the totality of the facts and circumstances in the transactions described in Situations 1 and 2, X does not acquire the benefits and burdens of ownership and consequently cannot claim tax benefits as the owner of the property. The transactions described above are, in substance, fundamentally different from the sale-leaseback transaction respected by the Court in Frank Lyon.

First, in Frank Lyon, the sales proceeds were used to construct the lessee's new headquarters. In contrast, in the transactions described above, substantially all of the $105x sales proceeds are immediately set aside by FP to satisfy its obligations under the Lease and to fund FP's exercise of the Purchase Option or the Early Termination Option. As a condition to engaging in the transactions, FP economically defeases substantially all of its rent payment obligations and the amounts due under the Purchase Option or the Early Termination Option by establishing and pledging the deposit with BK3 and the Equity Collateral. Moreover, even though FP may not pledge the deposit with BK4, FP fully funds its remaining rent obligations with the BK4 deposit and may have limited rights to access the funds held in that deposit. Consequently, the only capital retained by FP is the remaining $6x portion of the sales proceeds that represents FP's fee for engaging in the transaction.

Second, in Frank Lyon, the taxpayer bore the risk of the lessee's nonpayment of rent, which could have forced the taxpayer to default on its recourse debt. The Court concluded that the taxpayer exposed its business well-being to a real and substantial risk of nonpayment and that the long-term debt affected its financial position. Frank Lyon, 435 U.S. at 577. In contrast, in the transactions described above, economic defeasance renders the risk to X of FP's failure to pay rent remote. Moreover, because of the economic defeasance, X's right to receive the Equity Collateral upon the exercise of the Purchase Option, and FP's obligation with respect to the Termination Value, a failure by FP to satisfy its lease obligations does not leave X at risk for repaying the loan balances or forfeiting its equity investment.

Third, in Frank Lyon, the taxpayer's return was dependent on the property's value and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the taxpayer's equity investment was at risk if the property declined in value. The economic burden of any decline in the value of the property is integral to the determination of tax ownership. See, e.g., Swift Dodge v. Commissioner, 692 F.2d 651 (9th Cir. 1982). In the transactions described above, X bears insufficient risk of a decline in the value of the property to be treated as its owner for tax purposes. In Situation 1, regardless of a decline in the value of the property, X can recover its entire investment, repay both loans, and obtain a minimum after-tax rate of return on its equity investment by exercising the Service Contract Option. Similarly, in Situation 2, a decline in the value of the property will not prevent X from recovering its entire investment, repaying both loans and obtaining a minimum after-tax rate of return on its equity investment through the rents for the remaining Lease Term plus the Residual Value Insurance Amount under the Return Option. The failure of FP to satisfy its obligations under the Service Contract Option in Situation 1 or the Return Option in Situation 2 results in default and obligates FP to pay X the Termination Value. In both Situation 1 and Situation 2, the BK3 and BK4 deposits and Equity Collateral are available to fund FP's obligations upon termination of the Lease. Thus, in both situations, X has substantially limited its risk of loss regardless of the value of the property upon termination of the Lease.

Fourth, the combination of FP's Purchase Option and X's Service Contract Option in Situation 1, and FP's Early Termination Option and continued rent and residual value insurance obligations under the Return Option in Situation 2, significantly increase the likelihood that FP will exercise its Purchase Option in Situation 1 and its Early Termination Option in Situation 2 even if the fair market value of the property is less than the Purchase Option Exercise Price or ETO Exercise Price, respectively, because both options are fully funded and the excess of the exercise price over the leased property's fair market value may not fully reflect the costs to FP of modifying, interrupting, or relocating its operations. See Kwiat v. Commissioner, T.C. Memo. 1992-433 (ostensible lessor did not possess the benefits and burdens of ownership because reciprocal put and call options limited the risk of economic depreciation and the benefit of possible appreciation); see also Aderholt Specialty Co. v. Commissioner, T.C. Memo. 1985-491; Rev. Rul. 72-543, 1972-2 C.B. 87. In contrast, in Frank Lyon, the lessee's decision regarding the exercise of its purchase option was not constrained by a lessor's right to exercise a reciprocal option similar to the Service Contract Option or the Return Option described in Situations 1 and 2, respectively. Similarly, X's opportunity to recognize a return through refinancing the BK1 and BK2 loans is also limited in those cases in which FP has a right to participate in any savings attributable to reduced financing costs, such as through renegotiation of the Lease rents and the Purchase Option price. See Hilton v. Commissioner, 74 T.C. 305 (1980), aff'd, 671 F.2d 316 (9th Cir. 1982) (arrangement whereby lessor and lessee shared the savings from any refinancing of lessor's nonrecourse debt was a factor supporting holding to disregard form of sale-leaseback transaction).

In the transactions described above, X does not have a meaningful interest in the risks and rewards of the property. Thus, X does not acquire the benefits and burdens of ownership of the property and does not become the owner of the property for U.S. federal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

income tax purposes. In substance, the transactions described above are merely a transfer of tax benefits to X, coupled with X's investment of the Equity Collateral for a predetermined aftertax rate of return.

Furthermore, in appropriate cases, the Service may challenge the purported tax benefits from these transactions on additional grounds, including (1) that the substance over form doctrine requires recharacterization of the arrangement as a financing arrangement, or (2) that the loans from BK1 and BK2, in substance, do not involve the use or forbearance of money, do not constitute valid indebtedness for tax purposes, and that any interest nominally paid or accrued on the loans is not deductible. Cf. Rev. Rul. 2002-69, 2002-2 C.B. 760 (disregarded offsetting obligations in a LILO arrangement gave the taxpayer, at most, a future interest in the property).

The American Jobs Creation Act of 2004, P.L. 108-357, 118 Stat. 1418 (the "Act"), was enacted on October 22, 2004. Section 847 of the Act amended §§ 167 and 168 to provide that service contracts that follow a lease must be included in the lease term and to modify the recovery period for qualified technological equipment and computer software subject to a lease with a tax-exempt entity. Section 848 of the Act added new § 470, which suspends losses for certain leases of property to tax-exempt entities. See H.R. Rep. No. 755, 108th Cong., 2d Sess., at 660, 662-663 (2004). These amendments generally are effective for leases entered into after March 12, 2004. [FN4]

Transactions that are the same as, or substantially similar to, the transactions described in this notice are identified as "listed transactions" for purposes of § 1.6011-4(b)(2) and §§ 6111 and 6112 effective February 11, 2005, the date this notice is released to the public. Independent of their classification as "listed transactions," transactions that are the same as, or substantially similar to, the transactions described in this notice may already be subject to the requirements of § 6011, § 6111, or § 6112, or the regulations thereunder. Persons required to disclose these transactions under § 1.6011-4 who fail to do so may be subject to the penalty under § 6707A. [FN5] Persons required to disclose or register these transactions under § 6111 who have failed to do so may be subject to the penalty under § 6707(a). Persons required to maintain lists of investors under § 6112 who have failed to do so (or who fail to provide such lists when requested by the Service) may be subject to the penalty under § 6708(a). In addition, the Service may impose penalties on parties involved in these transactions or substantially similar transactions, including accuracy-related penalties under § 6662 or § 6662A.

The Service and the Treasury Department recognize that some taxpayers may have filed tax returns taking the position that they were entitled to the purported tax benefits of the types of transactions described in this notice. These taxpayers should consult with a tax advisor to ensure that their transactions are disclosed properly and to take appropriate corrective action.

DRAFTING INFORMATION

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

For further information regarding this notice, contact John Aramburu at (202) 622-4960 (not a toll-free call).

FN1. In some instances, FP meets the definition of a tax-exempt entity under section 168(h)(2). In other instances, FP does not meet that definition but possesses attributes, such as net operating losses, that render FP tax indifferent.

FN2. The arrangement by which FP sets aside the funds necessary to meet its obligations under the Lease may take a variety of forms other than a deposit arrangement involving BK3 and BK4. These arrangements include a loan by FP to X, BK1 or BK2; a letter of credit collateralized with cash or cash equivalents; a payment undertaking agreement; prepaid rent (regardless of whether X finances a portion of the purchase price by borrowing from BK1 or BK2); a sinking fund arrangement; a guaranteed investment contract; or financial guaranty insurance.

FN3. The arrangement by which the return of X's equity investment plus a predetermined after-tax return on such investment is provided may take a variety of forms other than an investment by FP in highly rated debt securities. For example, FP may be required to obtain a payment undertaking agreement from an entity having a specified minimum credit rating.

FN4. Leases or purported leases of Qualified Transportation Property described in section 849(b) of the Act are not identified as listed transactions subject to the terms of this notice.

FN5. Section 6707A applies to returns and statements due after October 22, 2004. See Notice 2005-11, 2005-7 I.R.B. 493.

Notice 2005-13, 2005-9 I.R.B. 630, 2005 WL 327549 (IRS NOT)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.