IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-198T |
| | ) | |
| TEXTRON INC. and SUBSIDIARIES | ) | |
| | ) | |
| Respondent. | ) | |

**RESPONDENT, TEXTRON INC.'S OBJECTION TO GOVERNMENT'S PETITION TO ENFORCE INTERNAL REVENUE SUMMONS**

Respondent, Textron Inc. and subsidiaries ("Textron"), by and through its attorneys, hereby asks this Court to deny the government's petition for an order enforcing the Internal Revenue Service ("IRS") summons served on Textron. In support of its objection, Textron alleges as follows:

1. Textron agrees with petitioner that this Court has jurisdiction over the matter.

2. Textron agrees with petitioner that venue over this matter is proper in the District of Rhode Island.

3. In order to obtain enforcement of the summons, the government must establish that the summons was issued for a proper purpose. *United States v. Powell,* 379 U.S. 48, 58 (1964). Initially, the government "must make a prima facie showing" of a proper purpose. *United States v. Gertner*, 65 F.3d 963, 966 (1st Cir. 1995). Then, "[o]nce this minimal showing surfaces, the burden shifts to the taxpayer to . . . create a 'substantial question in the court's mind regarding the validity of the government's purpose.'" *Id.* at 967, *citing United States v. Salter,* 432 F.2d 697, 700 (1st Cir. 1970). To meet its burden, Textron submits and incorporates by

reference the Affidavits of Edward Andrews, Roxanne Cassidy, Debra Raymond, Norm Richter, and Mark Weston, and also relies on the references cited in its supporting memorandum, Memorandum of Respondent, Textron Inc., In Opposition to Petitioner United States of America's Petition to Enforce Summons (at pages 5 and 6). This showing supports Textron's position that IRS's alleged need for information to conduct its audit is "a pretext disguising its real objective[s]" (*Id*. at 965), one of which is to obtain the purely legal analysis of Textron's tax advisors. A related objective is to exert pressure on Textron to accept IRS settlement terms that require Textron to concede certain disputed taxes and to forego its right to contest the merits of the IRS's position on the underlying issue in federal court, in return for which the government will withdraw the request for tax accrual workpapers and the legal analysis contained therein. In this context, the IRS request for tax accrual workpapers is a "bargaining chip." These facts (not revealed in the Petition) create a "substantial question . . . regarding the validity of the government's purpose," and the burden of persuasion on this question should shift to the government. *Id.* at 967-68 (without deciding, the First Circuit stated that "we are hard-pressed to fathom" why the burden would not be on the government).

4. The IRS's power to obtain information by summons is "not absolute and is limited by the traditional privileges, including the attorney client privilege" and the work product doctrine. *Upjohn Co. v. United States*, 449 U.S. 383, 398 (1981).

5. The tax accrual workpapers sought in the IRS's summons contain legal advice of the type that is protected from disclosure by (1) the work product doctrine and (2) the attorney client privilege, as expanded by the Internal Revenue Code ("Code") § 7525 tax practitioner privilege. In support of its position, Textron submits and incorporates by reference the Affidavits of Edward Andrews, Roxanne Cassidy, Debra Raymond, Norm Richter, and Mark

Weston, and also relies on the references cited in its supporting memorandum, Memorandum of Respondent, Textron Inc., In Opposition to Petitioner United States of America's Petition to Enforce Summons (at pages 6 through 20).

WHEREFORE, Textron respectfully requests that the Court:

A. Deny the government's petition for an order enforcing the IRS summons served on Textron

B. Deny the government's request to recover its costs incurred in maintaining this action; and

C. Grant such other and further relief as it deems is just and proper.

TEXTRON INC. AND SUBSIDIARIES
By their attorneys

/s/ John A. Tarantino

JOHN A. TARANTINO, #2586
PATRICIA K. ROCHA, #2793
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel: (401) 274-7200
Fax: (401) 351-4607

ARTHUR L. BAILEY
J. WALKER JOHNSON
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 429-3000
Fax: (202) 429-3902
*(admitted pro hac vice)*

Dated: August 11, 2006

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vi. | ) | C.A. No. 06-198T |
| | ) | |
| TEXTRON INC. and SUBSIDIARIES | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OF RESPONDENT, TEXTRON INC., IN OPPOSITION TO PETITIONER UNITED STATES OF AMERICA'S PETITION TO ENFORCE SUMMONS**

TEXTRON INC. AND SUBSIDIARIES
By their attorneys

JOHN A. TARANTINO, #2586
PATRICIA K. ROCHA, #2793
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel: (401) 274-7200
Fax: (401) 351-4607

ARTHUR L. BAILEY
J. WALKER JOHNSON
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 429-3000
Fax: (202) 429-3902
*(admitted pro hac vice)*

Dated: August 11, 2006

TABLE OF CONTENTS


Page

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Question Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I. The IRS Does Not Have Absolute Power to Obtain Information by Summons . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II. Textron's and TFC's Tax Accrual Workpapers Are Entitled to Protection Against Disclosure under the Work Product Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

A. Textron's and TFC's Tax Accrual Workpapers Are Entitled To Work Product Protection . . . . . . . . . . . . . . . . . 7

B. The Government Has Not Made the Required Showing of Need for the Tax Accrual Workpapers . . . . . . . . . . 11

C. Textron and TFC Did Not Waive Work Product Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III. Textron's and TFC's Tax Accrual Workpapers Are Entitled to Protection Against Disclosure under the Attorney Client Privilege and Code § 7525 . . . . . . . . . . . . . . . . . . . . . . 14

A. Communications Between Textron and Its In-House Tax Attorneys Are Protected by the Attorney Client Privilege . . . . . . . . . . . . . . . . . . . . . . . . . 14

B. Communications Between TFC and Textron In-House Tax Attorneys Also Are Protected by the Attorney Client Privilege . . . . . . . . . . . . . . . . . . . . . . . . . 15

C. Communications Between TFC and Its In-House CPAs Are Protected by the Code § 7525 Tax Practitioner Privilege . . . . . . . . . . . . . . . . . . 16

D. Textron and TFC Did not Waive the Attorney Client and Code § 7525 Privileges . . . . . . . . . . . . . . . . . . . . . . 17

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Affidavits:

Affidavit of Edward Andrews (Exhibit 1)

Affidavit of Roxanne Cassidy (Exhibit 2)

Affidavit of Deborah Raymond (Exhibit 3)

Affidavit of Norman Richter (Exhibit 4)

Affidavit of Mark Weston (Exhibit 5)

# TABLE OF AUTHORITIES

Page

Cases:

*Am. S.S. Owners Mutual Protection & Indem. Ass'n, Inc. v. Alcoa S.S. Co.*, No. 04 Civ. 4309 (LAK) (JCF), 2006 U.S. Dist. LEXIS 4265 (S.D.N.Y. Feb. 2, 2006) . . . . . . . . . . . . . . . . . 10

*Cavallaro v. United States*, 284 F.3d 236 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . 14, 18

*Couch v. United States*, 409 U.S. 322 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Delaney, Migdail & Young, Chartered v. IRS*, 826 F.2d 124 (D.C. Cir. 1987) . . . . . 10

*Frank Betz Assocs. Inc. v. Jim Walter Homes, Inc.*, 226 F.R.D. 533 (D.S.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 13

*Frank Lyon Co. v. United States*, 435 U.S. 561 (1978) . . . . . . . . . . . . . . . . . . . . . . 1

*Gramm v. Horsehead Indus., Inc.*, No. 87 Civ. 5122 (MJL), 1990 U.S. Dist. LEXIS 773, at *14 (S.D.N.Y Jan 25, 1990) . . . . . . . . . . . . 14

*Gutter v. E.I. duPont De Nemours & Co.*, No. 95-2152-CIV-GOLD 1998 U.S. Dist. LEXIS 23207 (S.D. Fla. May 15, 1998) . . . . . . . . . . . . . . 13, 18

*Hickman v. Taylor*, 329 U.S. 495 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Diasonics Secs. Litig.*, No. C-83-4584 RFP, 1986 U.S. Dist. LEXIS 22750 (N.D. Cal. July 15, 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Grand Jury Subpoena*, 220 F.R.D. 130 (D.C. Mass. 2004) . . . . . . . . . . . . . . . 12

*In re Pfizer Inc. Secs. Litig.*, No. 90 CIV. 1260 (SS), 1993 U.S. Dist. LEXIS 18215, at *18 (Dec. 22, 1993), *modified* 1994 U.S. Dist. LEXIS 7454 (S.D.N.Y. June 6, 1994) . . . . . . . 15, 18

*In re San Juan Dupont Plaza Hotel Fire Litig*, 859 F.2d 1007 (1st Cir. 1988) . . . . . 11

*In re Special September 1978 Grand Jury (II)*, 640 F.2d 49 (7th Cir. 1980) . . . . . . 10

*Maine v. Dept. of Interior*, 298 F.3d 60 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . 7, 8

*Medinol, Ltd. V. Boston Scientific Corp.*, 214 F.R.D. 113 (S.D.N.Y. 2002) . . . . . . . 13

*Merrill Lynch & Co. v. Alleghany Energy Supply Co.*,
229 F.R.D. 441 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 14

*Natta v. Zletz*, 418 F.2d 633 (7th Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Raytheon Secs. Litig.*, 218 F.R.D. 354 (D.C. Mass. 2003) . . . . . . . . . . . . . . . . . .8, 11, 14

*Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.*,
139 F.R.D. 609 (E.D. Pa. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9

*SEC v. R.J. Reynolds Tobacco Holdings, Inc.*,
Misc. Action No. 03-1651 (JDB), 2004 U.S. Dist. LEXIS 24545,
at *24 (D.D.C. June 29, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Simon v. G.D. Searle & Co.*, 816 F.2d 397 (8th Cir. 1987) . . . . . . . . . . . . . . . . . 9, 12

*So. Scrap Material Co. v. Fleming*, No. Civ. A 01-2554,
2003 WL 21474516 (E.D. La. June 18, 2003) . . . . . . . . . . . . . . . . . . . . . . . . 10

*Tronitech, Inc v. NCR Corp.*, 108 F.R.D. 655 (S.D. Ind. 1985) . . . . . . . . . . . . . . . . 10, 11

*United States v. Adlman*, 134 F.3d 1194 (2nd Cir. 1998) . . . . . . . . . . . . . 7, 8, 9, 14

*United States v. Admin. Co.*, 94-2 U.S.T.C. ¶ 50,479 (N.D. Ill. 1994), *aff'd sub nom. United States v. Admin. Enters*, 46 F.3d 670 (7th Cir. 1995) . . . . . 6

*United States v. Arthur Young & Co.*, 465 U.S. 805 (1984) . . . . . . . . . . . . . . . . 6, 7, 19

*United States v. Chevron Texaco Corp.*, 241 F. Supp. 2d 1065 (N.D. Cal. 2002) . 15, 16

*United States v. El Paso Co.*, 682 F.2d 530 (5th Cir. 1882) . . . . . . . . . . . . 7, 11, 15,18

*United States v. Gertner*, 65 F.3d 963 (1st Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. MIT*, 129 F.3d 681 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . 10, 11, 12

*United States v. Powell*, 379 U.S. 48 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Upjohn Co. v. United States*, 449 U.S. 383 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 14

*Vanguard Savings & Loan Ass'n v. Banks*, Civ. Act. No. 93-CV-4627,
1995 U.S. Dist. LEXIS 13712 (E.D. Pa. Sept. 18, 1995) . . . . . . . . . . . . . . . . 10

Statutes:

Internal Revenue Code, 26 U.S.C., § 6662(d)(2)(C)(iii) . . . . . . . . . . . . . . . . . . . 16

Internal Revenue Code, 26 U.S.C., § 7525 . . . . . . . . . . . . . . . . . . . 1, 5, 7, 16, 17-20

Internal Revenue Code, 26 U.S.C., § 7525(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . 16

Internal Revenue Code, 26 U.S.C., § 7525(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . 16

Internal Revenue Code, 26 U.S.C., § 7525(a)(3)(B) . . . . . . . . . . . . . . . . . . . . . . 16

Internal Revenue Code, 26 U.S.C., § 7525(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

R.I. Gen. Laws, §5-3.1-23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Other Authorities:

American Institute of Certified Public Accountants ("AICPA")
Code of Professional Conduct, section 301 . . . . . . . . . . . . . . . . . . . . . . . . 14

Announcement 84-46, 1984-18 I.R.B. 18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Announcement 2002-63, 2002-2 C.B. 72 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

AU Section 9326: Evidential Matter –
Auditing Interpretations of Section 326 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fed. R. Civ. P. 26(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11

Internal Revenue Manual, § 4.10.20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Internal Revenue Manual, § 4.10.20.3.2.3.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Notice 98-5, 1998-1 C.B. 334 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Notice 2004-19, 2004-1 C.B. 606 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Notice 2005-13, 2005-9 I.R.B. 630 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Remarks of IRS Chief Counsel Donald Korb on
September 27, 2004, 2004 TNT 197-65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Rev. Proc. 2001-28, 2001-1 C.B. 1156 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

S. Rep. No. 105-174, at 70 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

144 Cong. Rec. 14,735 (1998) (statement of Sen. Mack) . . . . . . . . . . . . . . . . . . . 17

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vii. | ) | C.A. No. 06-198T |
| | ) | |
| TEXTRON INC. and SUBSIDIARIES | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OF RESPONDENT, TEXTRON INC., IN OPPOSITION TO PETITIONER UNITED STATES OF AMERICA'S PETITION TO ENFORCE SUMMONS**

**Introduction**

In this action, the IRS seeks from Textron Inc. and its subsidiaries ("Textron") the confidential legal advice that Textron received from its in-house tax attorneys regarding the hazards of litigation faced by Textron on matters in controversy or potentially in controversy between Textron and the IRS. This legal advice is protected from disclosure by (1) the work product doctrine and (2) the attorney client privilege, as expanded by the Internal Revenue Code ("Code") § 7525 tax practitioner privilege. In no other context would a federal court force one party to provide to its opposing party this highly sensitive legal advice when, as here, the legal advice is validly protected and privileged. Thus, the IRS summons should not be enforced.

**Statement of Facts**

Textron Financial Co. ("TFC") is a financing subsidiary of Textron Inc. In 2001, TFC entered into nine leveraged lease transactions. Those transactions comply with the IRS's leveraged lease guidelines and the requirements established by the leveraged lease case law. *E.g.*, Rev. Proc. 2001-28, 2001-1 C.B. 1156; *Frank Lyon Co. v. United States*, 435 U.S. 561

(1978) (holding a leveraged lease valid for tax purposes). TFC was guided in this process by legal opinions received from outside legal counsel. (Raymond Af. ¶1, 6; Richter Af. ¶23.)[1]

Four years later, in 2005, the IRS issued Notice 2005-13, 2005-9 I.R.B. 630, designating certain leveraged lease transactions as "listed transactions." The fact that the IRS "listed" these transactions means only that the IRS has decided to challenge their tax treatment. The IRS's position in Notice 2005-13 has not been (but likely will be) reviewed by the federal courts.

In turn, the issuance of Notice 2005-13 prompted the IRS to invoke against Textron and TFC its previously announced tax accrual workpaper initiative (the "Initiative"). Announcement 2002-63, 2002-2 C.B. 72; Internal Revenue Manual § 4.10.20 ("I.R.M."). Under the Initiative, the IRS requests the tax accrual workpapers from taxpayers that have entered into more than one listed transaction. The expressed purpose of the Initiative is as follows:

> The new . . . [Initiative] forces corporate taxpayers to make a cost-benefit analysis before entering into risky transactions. When a company considers investing in a shelter, they will need to factor into their decision the strong possibility that the Service will seek their tax accrual workpapers.

2004 TNT 197-65 (remarks of IRS Chief Counsel Donald Korb on September 27, 2004). Because TFC entered into its leveraged lease transactions in 2001, before the Initiative was announced in 2002 and before the transactions were "listed" in 2005, this expressed "cost-benefit" purpose is not achieved by retroactively invoking the Initiative here. (Richter Af. ¶24.)

Pursuant to the Initiative, on June 2, 2005, the IRS issued its summons for tax accrual workpapers for the year 2001. The summons seeks the workpapers not just for TFC, but also for Textron and its other subsidiaries (which have not entered into listed transactions).

[1] Citations hereafter are to the Affidavits of Edward M. Andrews ("Andrews Af."), (Ex. 1) Roxanne Cassidy ("Cassidy Af."), (Ex. 2) Debra Raymond ("Raymond Af."), (Ex. 3) Norman Richter ("Richter Af."), (Ex. 4) and Mark Weston ("Weston Af.") (Ex. 5).

The IRS commenced the audit that includes the year 2001 in April 2003, and when the summons was issued on June 2, 2005, that audit was substantially complete. As of June 2, 2005, the IRS had issued to Textron 522 formal requests for information. The IRS issued only two additional information requests after June 2, 2005. All of the 524 information requests are closed, except for the request for workpapers. (Andrews Af. ¶¶8, 10; Richter Af. ¶¶ 21-22.)

The IRS issued 101 information requests on the 2001 leveraged lease transactions, and Textron responded to all of them. As of June 2, 2005, the IRS was, and it remains, able to request additional information regarding those transactions, or any other Textron transaction. However, the IRS has not done so. The only information that the IRS now seeks from Textron is the legal advice contained in 2001 tax accrual workpapers. (Andrews Af. ¶¶9-10.)

In 2001 and 2002, Textron's tax department included six tax attorneys who provided legal advice to Textron. During this time, TFC's tax department included numerous CPAs. TFC's tax department was accountable to the head of Textron's tax department (an attorney), and one Textron attorney was assigned to provide legal advice to TFC. (Richter Af. ¶¶4-6.)

These attorneys and CPAs counseled Textron and TFC regarding proposed transactions and, as they did so, they analyzed the merits of tax law issues the IRS could raise, and determined hazards of litigation percentages for those issues. These determinations reflect the potential for litigation regarding the identified issues and the attorneys' analyses regarding the potential outcome of such litigation based on the Internal Revenue Code, Treasury regulations, case law, and IRS rulings. (Richter Af. ¶¶2, 4-5, 13-18; Cassidy Af. ¶17; Raymond Af. ¶¶9-10.)

The tax attorneys use these hazards of litigation percentages to advise Textron and TFC when the IRS asserts tax adjustments, and when settlement and litigation decisions are made. As is typical for large corporate taxpayers, the IRS audits every Textron tax year. Proposed

adjustments have been resolved administratively with the IRS, and have been litigated in court. For the tax years 1987 to 1992, Textron and the IRS litigated IRS-proposed adjustments in the United States Tax Court, and successfully appealed one issue to the First Circuit. Thus, Textron prepared the hazards of litigation percentages because it anticipated that litigation was a reasonable prospect. (Andrews Af. ¶3; Richter Af. ¶18.)

During 2001 and early 2002, the attorneys in Textron's tax department also used the issues they identified as potentially in dispute, and their hazards of litigation assessments for those issues, in the preparation of the Textron 2001 tax accrual workpapers. Similarly, the CPAs in TFC's tax department, assisted by attorneys in Textron's tax department, used the issues they identified as potentially in dispute, and their hazards of litigation assessments for those issues, to prepare the TFC 2001 tax accrual workpapers. (Raymond Af. ¶¶9-12; Cassidy Af. ¶¶6-12.)

The key document contained in the 2001 workpapers is a spreadsheet that lists the issues identified by the tax advisors and, for each issue, the hazards of litigation percentage determined by the tax advisors. Then, for each issue the spreadsheet uses the hazards of litigation percentage to produce a "tax reserve" amount. The spreadsheet then adds the tax reserve amounts for all issues into an aggregate total. On TFC's and Textron's 2001 financial statements, the aggregate total of the tax reserve amounts is combined with other liability amounts (tax and non-tax) and reported as a larger aggregate amount. The tax reserve amounts are not individually disclosed and cannot be determined by reviewing the financial statements. The remaining documents in the 2001 tax accrual workpapers are variations of this spreadsheet, drafts of it, and various types of backup documentation. These workpapers were maintained in a confidential manner. (Richter Af. ¶13; Cassidy Af. ¶¶ 4-5, 18-19; Raymond Af. ¶¶ 7-8, 20.)

Textron and TFC are audited by separate groups of auditors from Ernst & Young ("E&Y"). (Weston Af. ¶¶1-6.; Raymond Af. ¶13.) During the course of E&Y's audit of Textron's and TFC's financial statements for the year 2001, E&Y was shown the 2001 tax accrual workpapers. E&Y was obligated to keep the contents of the 2001 workpapers confidential, and it has done so. (Richter Af. ¶11; Cassidy Af. ¶¶ 13-16; Raymond Af. ¶¶ 13-18.)

**Question Presented**

Whether it is improper for the IRS to use this summons enforcement proceeding to obtain confidential legal advice that is protected from disclosure by (1) the work product doctrine and (2) the attorney client privilege, as expanded by the Code § 7525 tax practitioner privilege.

**Argument**

## I. The IRS Does Not Have Absolute Power to Obtain Information by Summons

Ordinarily, the IRS does not request tax accrual workpapers during an audit. Announcement 84-46, 1984-18 I.R.B. 18. Here, the IRS had effectively completed its audit without requesting tax accrual workpapers. When the IRS issued the summons, Textron already had responded to the IRS's requests for information on the leveraged lease transactions, and the IRS already had issued its formal notice proposing to disallow the tax treatment claimed for those transactions. The IRS issued the summons only after Notice 2005-13 was issued, which made the Initiative applicable to Textron four years after it had entered into its transactions.

In reality, the IRS's alleged need for information to conduct its audit thus is "a pretext disguising its real objective[s] . . .." *United States v. Gertner*, 65 F.3d 963, 965 (1st Cir. 1995). First, the information in the workpapers that the IRS is keen to obtain are the issues that Textron's and TFC's tax advisors have identified, the hazards of litigation percentages determined by those advisors for each issue, and the resulting reserve for each issue. The IRS

request thus improperly seeks, as one objective, a "forced revelation of a party's evaluation of his case . . . to take advantage of the other's assessment of his prospects for victory and an acceptable settlement figure." *Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.*, 139 F.R.D. 609, 614 (E.D. Pa. 1991). Second, because the IRS offers to withdraw its request for workpapers if a taxpayer agrees to concede (paying tax, interest and penalties) the "listed transaction" that prompted the request (IRM § 4.10.20.3.2.3.4), the workpaper request serves a second improper purpose, using the workpaper request as a means of "put[ting] pressure on a taxpayer to settle." *United States v. Powell*, 379 U.S. 48, 58 (1964); *United States v. Admin. Co.*, 94-2 U.S.T.C. ¶ 50,479 (N.D. Ill. 1994), *aff'd sub nom. United States v. Admin. Enters*, 46 F.3d 670 (7th Cir. 1995). A third improper purpose is intended where taxpayers are merely evaluating an investment in a listed transaction. There, the IRS intends to use the threat of a workpaper request as a lever to discourage investment in a transaction by changing the "cost-benefit analysis," irrespective of whether the transaction is perfectly legal.

These facts (not revealed in the Petition) create a "substantial question . . . regarding the validity of the government's purpose," and the burden of persuasion on this question should shift to the government. *Gertner*, 65 F.3d at 967-68 (citation omitted) (without deciding, stating that "[w]e are hard-pressed to fathom" why the burden would not be on the IRS).

Moreover, the IRS's power to obtain information by summons is "not absolute and is limited by the traditional privileges, including the attorney client privilege" and the work product doctrine. *Upjohn Co. v. United States*, 449 U.S. 383, 398 (1981). These doctrines apply here.

## II. Textron's and TFC's Tax Accrual Workpapers Are Entitled to Protection Against Disclosure under the Work Product Doctrine

The government relies on *United States v. Arthur Young & Co.*, 465 U.S. 805 (1984), stating that "[a]t issue there, as is the case here, the IRS sought tax accrual workpapers." (Brief

in Support of Petition to Enforce Summons at 10 ("Brief").) However, *Arthur Young* is clearly inapposite. There, in its audit of a taxpayer, the IRS issued a summons to Arthur Young, the taxpayer's accountant, for the tax accrual workpapers created and held by Arthur Young. These workpapers were prepared by accountants, not attorneys, and none of the "traditional privileges," which are in dispute here, protected Arthur Young's workpapers. Instead, Arthur Young asked the Court to "create a so-called privilege for the independent auditor's workpapers." 465 U.S. at 815. The Court declined, noting that "no confidential accountant-client privilege exists under federal law," and holding that none should be created absent direction from Congress.[2] *Id*. at 817 (*quoting Couch v. United States*, 409 U.S. 322, 335 (1973)). In addition, the Court declined to create for accountants a new "analogue to the attorney work-product doctrine . . .." *Id.* In contrast, here the IRS seeks the taxpayer's workpapers, and the "traditional privileges" do apply. We now turn to that analysis.

### A. Textron's and TFC's Tax Accrual Workpapers Are Entitled to Work Product Protection

Documents are entitled to work product protection if they are "prepared in anticipation of litigation" by a party's attorneys or other representatives. Fed. R. Civ. P. 26(b)(3); *Hickman v. Taylor*, 329 U.S. 495 (1947). The First Circuit interprets the "anticipation of litigation" requirement as a "because of" test, protecting documents "prepared or obtained because of the prospect of litigation." *Maine v. Dep't of Interior*, 298 F.3d 60, 67-68 (1st Cir. 2002), (*quoting and citing United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998)).[3]

[2] As discussed below, subsequently Congress did enact Code section 7525, which created an accountant-client or "tax practitioner" privilege.

[3] The government's brief (at 14) cites *United States v. El Paso Co.*, 682 F.2d 530 (5th Cir. 1982). There, the Fifth Circuit applied the "primary motivating purpose" test and held that

In *Maine*, the First Circuit "agree[d] with the formulation of the work-product rule adopted in *Adlman* . . .." 298 F.3d at 68. In *Adlman*, the taxpayer/corporation was contemplating a merger. The taxpayer's in-house tax advisor expected that the IRS would challenge the tax treatment of the merger and that litigation would result. The tax advisor had an accounting firm prepare a memorandum evaluating the merits of the tax issues, and the IRS issued a summons to obtain that memorandum. Relying on the language and policy underlying the work product rule, the court held that "work-product protection should not be denied to a document that analyzes expected litigation merely because it is prepared to assist in a business decision." 134 F.3d at 1199. In an example directly applicable here, the court gave the following as an example of a work product protected document:

> Financial statements include reserves for projected litigation. The company's independent auditor requests a memorandum prepared by the company's attorneys estimating the likelihood of success in litigation and an accompanying analysis of the company's legal strategies and options to assist it in estimating what should be reserved for litigation losses.

*Id.* at 1200. Company attorneys often make legal assessments of potential liabilities posed by anticipated litigation over patent, tort, tax, or other issues, and those assessments are reflected in contingency reserves. Tax contingency reserves are indistinguishable from other contingency reserves,[4] and legal analysis contained in the tax accrual workpapers at issue here is indistinguishable from legal analysis in the documents considered in the oft cited *Adlman* case. *Raytheon Secs. Litig.*, 218 F.R.D. 354, 357-59 (D. Mass. 2003).

---

tax accrual workpapers were not work product protected. *El Paso* is not relevant here, because the First Circuit uses the "because of" test and rejects the "primary motivating purpose" test.

[4] Textron and TFC have such other contingency reserves. On their financial statements, tax contingency reserves and other contingency reserves are reported in the aggregate.

Another seminal case on this subject is *Simon v. G.D. Searle & Co.*, 816 F.2d 397 (8th Cir. 1987). There, the Searle company prepared risk management documents that reflected product liability risk assessments. The court held that:

> Although the risk management documents were not themselves prepared in anticipation of litigation, they may be protected from discovery to the extent that they disclose the individual case reserves calculated by Searle's attorneys. The individual case reserve figures reveal the mental impressions, thoughts, and conclusions of an attorney in evaluating a legal claim. By their very nature they are prepared in anticipation of litigation and, consequently, they are protected from discovery as opinion work product.

*Id.* at 401; *SEC v. R.J. Reynolds Tobacco Holdings, Inc.*, Misc. Action No. 03-1651 (JDB), 2004 U.S. Dist. LEXIS 24545, at *24 (D.D.C. June 29, 2004). This reasoning directly applies to the workpapers at issue here.

Some courts hold that while each individual reserve analysis is work product protected, when those individual reserves are aggregated into a single total, that total is not protected. The court in *Simon* reasoned that " [w]e do not believe, however, that the aggregate reserve information reveals the individual case reserve figures to a degree that brings the aggregates within the protection of the work product doctrine." 816 F.2d at 401-02. Other courts, however, have protected both the specific and the aggregate reserve information. For example in *Rhone-Poulenc*, the court held that "the aggregate reserve figures may give some insight into the mental processes of the lawyers in setting specific case reserves" and thus are protected. 139 F.R.D. at 614. *Frank Betz Assocs. Inc. v. Jim Walter Homes, Inc.*, 226 F.R.D. 533 (D.S.C. 2005).

In its Brief, the government contends (at 16-17) that the tax accrual workpapers are not entitled to work product protection because they are business documents prepared in the ordinary course of business. This notion is refuted by cases such as *Adlman, Simon,* and *Rhone-Poulenc*, which protect documents created for the business purpose of creating contingency reserves

because they contain legal analysis. As the court held in *Tronitech, Inc. v. NCR Corp.*, 108 F.R.D. 655, 656 (S.D. Ind. 1985):

> An audit letter [sent by the taxpayer's attorney to an outside accountant] is not prepared in the ordinary course of business but rather arises only in the event of litigation. It is prepared because of the litigation, and it is comprised of the sum total of the attorney's conclusions and legal theories concerning that litigation. Consequently, it should be protected by the work product privilege.

*Id.* *Accord So. Scrap Material Co. v. Fleming,* No. Civ. A 01-2554, 2003 WL 21474516 (E.D. La. June 18, 2003). Indeed, in *Delaney, Migdail & Young, Chartered v. IRS,* 826 F.2d 124 (D.C. Cir. 1987), the IRS advanced this position to its own advantage. There, IRS attorneys prepared legal analyses to help the IRS make the business decision whether to adopt a statistical sampling audit program. At the IRS's urging, the court found the documents were work product protected. *Id.* at 127. *See also United States v. MIT*, 129 F.3d 681, 687 (1st Cir. 1997) (The government assumed on brief that "the district court erred in concluding that work product lost its protection when repeated in another confidential document not prepared in anticipation of litigation.").

Indeed, a document with legal analysis will constitute protected legal analysis even if it is legally required to be prepared. For example, in *In re Special September 1978 Grand Jury (II),* 640 F.2d 49, 61-62 (7th Cir. 1980), the court held that legally required state campaign contribution reports, prepared with knowledge that litigation was possible, were work product protected. Likewise, in *Vanguard Savings & Loan Ass'n v. Banks*, Civ. Act. No. 93-CV-4627, 1995 U.S. Dist. LEXIS 13712 (E.D. Pa. Sept. 18, 1995), the court protected as work product documents "created primarily for the business purpose of satisfying the regulatory examination required by the Pennsylvania Department of Banking, [to the extent that] they contain individual case summaries with opinions as to the outcome of each litigation." *Id.* at *11. *Am. S.S. Owners Mutual Protection & Indem. Ass'n, Inc. v. Alcoa S.S. Co.,* No. 04 Civ. 4309 (LAK)

(JCF), 2006 U.S. Dist. LEXIS 4265 (S.D.N.Y. Feb. 2, 2006) (a document legally required to be submitted to the New York Insurance Department is entitled to work product protection).

On the "ordinary course of business" point, there is a final matter that requires clarification. The court in *El Paso* noted that El Paso created the tax accrual workpapers for financial accounting purposes and, thus they had "the aura of daily business." 682 F.2d at 544. In *Raytheon Secs. Litig.*, 218 F.R.D. at 359, the court cited this language from *El Paso* in its discussion regarding the "ordinary course of business" exclusion. However, it is clear that the Fifth Circuit's analysis on this point was that tax accrual workpapers do not meet the "primary" motivation test, which the First Circuit rejects. *See Tronitech,* 108 F.R.D. at 656-67 (discussing this issue). Under the First Circuit's "because of" test, workpapers containing litigation hazards analysis are work product protected.

### B. The Government Has Not Made the Required Showing of Need for the Tax Accrual Workpapers

Under Rule 26(b)(3), work product may be disclosed if a party can make a showing of "substantial need" for the information. Here, the IRS has made, and can make, no showing that it has a "substantial need" for the workpapers. In its audit of the tax year 2001, the IRS has had, and continues to have, the ability to seek all of the non-privileged and non-protected factual information it desires. Thus, the IRS has no need for the legal analyses at issue here.

Moreover, the opinion work product here, which consists of the "mental impressions, conclusions, opinions, or legal theories" of attorneys and other tax law advisers, enjoys heightened protection. Rule 26(b)(3) provides that "the court shall protect against disclosure" of this legal analysis. The extent of this heightened protection has yet to be defined in the First Circuit. *In re San Juan Dupont Plaza Hotel Fire Litig.*, 859 F.2d 1007, 1014-15 (1st Cir. 1988); *MIT*, 129 F.3d at 688. However, other courts have accorded "absolute protection" or protection

that is "nearly absolute." *In re Grand Jury Subpoena*, 220 F.R.D. 130, 145-46 (D. Mass. 2004) (citation omitted). The IRS has made no showing that can overcome this heightened protection.

**C. Textron and TFC Did not Waive Work Product Protection**

Textron and TFC did not waive their work product protection by including the aggregate tax contingency amounts with other tax and non-tax items on their financial statements. Because "individual figures lose their identity when combined to create the aggregate information," and because "it would be impossible to trace back and uncover the reserve for any individual case," the information was not disclosed by the financial statement reporting. *Simon*, 816 F.2d at 402.

The only other possibility is whether a waiver occurred when Textron and TFC allowed E&Y to review the workpapers. However, the case law firmly establishes that disclosure to an outside accountant that certifies financial statements ("outside accountant") is not a waiver.

The general principle is that work product protection is lost only if disclosure is made to an "adverse" party. *MIT,* 129 F.3d at 687; *Merrill Lynch & Co. v. Alleghany Energy Supply Inc. Co*., 229 F.R.D. 441 (S.D.N.Y. 2004). More specifically, work product protection is waived if disclosure is made to "an adversary or a conduit to a potential adversary." 229 F.R.D at 447.

For example, in *MIT* the First Circuit held that a waiver occurred when MIT disclosed information to the Defense Department Audit Agency that was examining MIT's defense contracts. The court reasoned that "the potential for dispute and even litigation was certainly there," making the Agency adverse. 129 F.3d at 687. As the court held in *Merrill Lynch,* "the DOD's audit agency was an adversary because it could potentially dispute a billing charge and file suit against MIT, not because of its duty to review MIT's accounts." 229 F.R.D. at 447. For these reasons, the Agency's adversarial role in *MIT* clearly is distinguishable from E&Y's function here.

Courts generally have embraced the rule that a company's outside accountant is not an adverse party, with the result that disclosure to the accountant does not waive work product protection. *Merrill Lynch*, a recent case that thoroughly reviews the relevant case law, summarizes the majority rule as follows:

> Thus, any tension between an auditor and a corporation that arises from an auditor's need to scrutinize and investigate a corporation's records and book-keeping practices simply is not the equivalent of an adversarial relationship contemplated by the work product doctrine. Nor should it be. A business and its auditor can and should be aligned insofar as they both seek to prevent, detect, and root out corporate fraud. Indeed, this is precisely the type of limited alliance that courts should encourage.

229 F.R.D. at 448. *Frank Betz,* 226 F.R.D. 533; *Gutter v. E.I. duPont De Nemours & Co.,* No. 95-2152-CIV-GOLD 1998 U.S. Dist. LEXIS 23207 (S.D. Fla. May 15, 1998).

A minority of courts has held that disclosure to accountants does waive work product protection. *Medinol, Ltd. v. Boston Scientific Corp.,* 214 F.R.D. 113 (S.D.N.Y. 2002); *In re Diasonics Secs. Litig.,* No. C-83-4584 RFP, 1986 U.S. Dist. LEXIS 22750 (N.D. Cal. July 15, 1986). However, that minority rule is erroneous. As the court held in *American Steamship,* 2006 U.S. Dist., LEXIS 4265, at *10:

> I respectfully decline to follow *Medinol*, however, because it appears to be directly in conflict with *Adlman.* In the example from *Adlman* cited above [*i.e.*, the example cited on page 8 of this memorandum], the opinion was provided to an independent auditor, and yet the Second Circuit did not suggest that any waiver might have occurred.

Here, disclosure to E&Y did not constitute a waiver because the confidentiality of the workpapers was not compromised and E&Y was not a "conduit to a potential adversary." *Merrill Lynch,* 229 F.R.D. at 447. As described in *Merrill Lynch*, an outside accountant is "under an ethical and professional obligation to maintain materials received from its client confidential, unless disclosure [is] required by law or accounting standards. *Id.* at 448;

*Raytheon Secs. Litig.*, 218 F.R.D. at 360 (same). Indeed, Rhode Island law requires that accountants maintain confidentiality. R.I. Gen. Laws § 5-3.1-23. Likewise, accounting standards also ensure confidentiality. *Merrill Lynch*, 229 F.R.D. at 449 (disclosure to the auditor "under the applicable accounting standards simply do not make out a waiver."). Similarly, the American Institute of Certified Public Accountants ("AICPA") Code of Professional Conduct, section 301, prohibits the disclosure of "confidential client information." *Gramm v. Horsehead Indus., Inc.*, No. 87 Civ. 5122 (MJL), 1990 U.S. Dist. LEXIS 773, at *14 (S.D.N.Y Jan 25, 1990) (stating that section 301 established a "reasonable expectation of confidentiality"). (Weston Af. ¶1-6.)

In sum, the tax accrual workpapers in issue were created and maintained in the "zone of privacy" protected by the work product doctrine, and the attorney-created legal opinions and advice in those workpapers should be protected against "unnecessary intrusion" from the IRS. *Adlman*, 134 F.3d at 1196.

## III. Textron's and TFC's Tax Accrual Workpapers Are Entitled to Protection Against Disclosure under the Attorney Client Privilege and Code § 7525

### A. Communications Between Textron and Its In-House Tax Attorneys Are Protected by the Attorney Client Privilege

In this case, attorneys in Textron's tax department considered confidential information provided by Textron regarding various transactions, and provided legal advice to Textron that was reflected in the hazards of litigation analyses in the Textron tax accrual workpapers. Such communications between management and in-house attorneys are covered by the attorney client privilege. *Upjohn Co.*, 449 U.S. at 390. Moreover, the legal advice satisfies the "essential elements" of the attorney client privilege. *Cavallaro v. United States*, 284 F.3d 236, 245 (1st

Cir. 2002). As the court held in *United States v. Chevron Texaco Corp.*, 241 F. Supp. 2d 1065, 1076 (N.D. Cal. 2002):

> Determining the tax consequences of a particular transaction is rooted virtually entirely in the law. The advisor must analyze the tax code, IRS rulings, decisions of the Tax Court, etc. Communications offering tax advice or discussing tax planning or the tax consequences of alternate business strategies are "legal" communications.

The case law establishes that tax accrual workpapers reflect privileged legal advice. In *El Paso*, the Fifth Circuit stated that "we would be reluctant to hold that a lawyer's analysis of the soft spots in a tax return and his judgments on the outcome of litigation on it are not legal advice." 682 F.2d at 539. This is consistent with the treatment of similar litigation contingency reserves. For example, in *In re Pfizer*, the court held that "documents containing individual case reserve figures are predominantly legal in nature. Therefore, those are privileged . . .." *In re Pfizer Inc. Secs. Litig.*, No. 90 CIV. 1260 (SS), 1993 U.S. Dist. LEXIS 18215, at *18 (Dec. 22, 1993), *modified* 1994 U.S. Dist. LEXIS 7454 (S.D.N.Y. June 6, 1994).

### B. Communications between TFC and Textron In-House Tax Attorneys Also Are Protected by Attorney Client Privilege

Attorneys in Textron's tax department also considered confidential information provided by TFC regarding various transactions, and the TFC tax accrual workpapers reflect their legal advice regarding the hazards of litigation inherent in those issues.

For the reasons set forth in section III.A. of this memorandum, the legal advice provided to TFC by the Textron attorneys is protected by the attorney client privilege.

### C. Communications Between TFC and Its In-House CPAs Are Protected by the Code § 7525 Tax Practitioner Privilege

CPAs in TFC's tax department considered confidential information provided by TFC regarding various transactions, and the TFC tax accrual workpapers reflect their tax advice regarding the hazards of litigation inherent in those issues.

Code § 7525(a)(1) provides that "the same common law protections of confidentiality which apply to a communication between a taxpayer and an attorney shall also apply to a communication between a taxpayer and any federally authorized tax practitioner to the extent the communication would be considered a privileged communication if it were between a taxpayer and an attorney." Code § 7525(a)(3)(A) provides that the term "federally authorized tax practitioner" includes persons authorized to practice before the IRS, which includes CPAs. S. Rep. No. 105-174, at 70 (1998). In turn, Code § 7525(a)(3)(B). defines "tax advice" as "advice given by an individual with respect to a matter that is within the scope of the individual's authority to practice" before the IRS. The advice of TFC's CPAs concerning the hazards of litigation on tax issues clearly is "tax advice" to TFC. *Cf. Chevron*, 241 F. Supp. 2d at 1076.

The government's Brief (at 15-16) questions whether the privilege is inapplicable because Code § 7525(b) provided (during the relevant period) that the privilege "shall not apply to any written communication . . . in connection with the promotion of the direct or indirect participation of the person in any tax shelter (as defined in section 6662(d)(2)(C)(iii)." That provision defines the term "tax shelter" as any "plan or arrangement . . . a significant purpose of . . . [which] is the avoidance or evasion of Federal income tax." However, this "tax shelter" exclusion is inapplicable here.

The statute expressly limits the "tax shelter" exclusion to tax advice given in connection with the "promotion" of a tax shelter. As noted in the floor statement of the Senator who

introduced the legislation, "[t]he amendment [adding the exclusion] was meant to target written promotional and solicitation materials used by the peddlers of corporate tax shelters . . .." 144 Cong. Rec. 14,735 (1998) (statement of Sen. Mack). Here, the advice was provided by TFC's own advisors, not by promoters. Thus, the "tax shelter" exclusion does not apply.

Moreover, the government places the cart before the horse by calling TFC's 2001 leveraged lease transactions "tax shelters." TFC's 2001 leveraged leases comply with the IRS guidelines and the case law requirements applicable to leveraged leases. The fact that the IRS lists a transaction does not mean the transaction is illegitimate. For example, the IRS "listed" a transaction in Notice 98-5, 1998-1 C.B. 334, unsuccessfully defended its position in litigation with an affected taxpayer, and then "de-listed" the transaction in Notice 2004-19, 2004-1 C.B. 606. Textron has and will continue to strenuously defend the 2001 leveraged lease transactions, in litigation if necessary.

The government further asserts (Brief at 16) that all other transactions (other than the 2001 leveraged leases) reflected in the tax accrual workpapers must also be "tax shelters," simply because they are reflected in the workpapers as issues the IRS might challenge. This overreaches. Tax issues can be complex and difficult, without a clear answer. The government's assertion that any transaction on which a taxpayer and the IRS disagree regarding the proper tax treatment involves a "tax shelter" is wholly unsupported and patently erroneous.

For the reasons set forth in section III.A. of this memorandum, the tax advice provided by the TFC CPAs to TFC is protected by the attorney client privilege.

### D. Textron and TFC Did not Waive the Attorney Client and Code § 7525 Privileges

The government asserts in its Brief (at 14) that TFC and Textron waived the attorney client and Code § 7525 privileges when they allowed E&Y partners to review the workpapers.

However, because those communications between TFC and Textron and those E&Y partners are protected and remain confidential under the Code § 7525 privilege, no waiver occurred and the tax accrual workpapers remain attorney client and Code § 7525 privileged.

It is well settled that when a client discloses the legal advice of its in-house attorneys to its outside attorneys, the client does not waive the attorney client privilege on the disclosed advice. *Natta v. Zletz,* 418 F.2d 633 (7th Cir. 1969). For the same reason, if a taxpayer discloses the legal advice of its in-house attorneys (or of its in-house CPAs) to persons whose tax advice to the taxpayer is privileged under Code § 7525, then there is no waiver of the privilege.

It is true that case law exists, which the government cites in its Brief (at 14), holding that when a taxpayer discloses advice from its attorneys to its outside auditor the attorney client privilege is waived.[5] However, these cases predate the enactment of Code § 7525, and reach that result because, at the time they were decided, there was no federal accountant-client privilege. In *El Paso,* the Fifth Circuit held that:

> No such [accountant-client] privilege exists under federal law, however, as we noted above. In the absence of a contrary rule established by law, we cannot view El Paso's discussions with its auditors as confidential. The attorney-client privilege is, therefore, waived.

682 F.2d. at 541. *In re Pfizer,* 1993 U.S. Dist. LEXIS 18215 at *22; *MIT,* 129 F.3d at 684-85; *Cavallaro,* 284 F.3d at 250. Now that Code § 7525 has been enacted, these cases strongly support the position that disclosure to an outside auditor does not waive attorney client privilege.

In its Brief (at 15), the government contends that communications with an outside accountant are not "tax advice" that is eligible for the Code § 7525 privilege. This is incorrect.

[5] Prior to the enactment of Code § 7525 "[w]hile disclosure to outside auditors may waive the attorney-client privilege, it does not waive the work product privilege, since there is an expectation that confidentiality of such information will be maintained by the recipient." *Gutter,* 1998 U.S. Dist. LEXIS 23207, at *9.

As described in *Arthur Young*, to assess a tax contingency reserve, the outside accountant must analyze and interpret the tax law:

> The independent auditor draws upon many sources in evaluating the sufficiency of the corporation's tax accrual account. Initially, the corporation's books, records, and tax returns must be analyzed in light of the relevant Code provisions, Treasury Regulations, Revenue Rulings, and case law.

465 U.S. at 812. The accounting standards promulgated by the AICPA emphasize that the accountant must analyze and opine on tax law issues. In AU Section 9326: Evidential Matter – Auditing Interpretations of Section 326 ("AU 9326"), ¶ 2.18, the AICPA states that an "auditor's education, training, and experience . . . enable him or her to be knowledgeable concerning income tax matters." In reviewing tax contingency reserves, the accountants must utilize their "tax expertise" (AU 9326, ¶¶ 2.19 & 2.21). While the auditor may review the legal opinions of in-house legal counsel on tax issues, the auditor cannot rely on those opinions (AU 9326, ¶ 2.17), but must analyze the legal issues and "formulate his or her own conclusion" (AU 9326, ¶ 2.22). In the end, the auditor must communicate that, regarding the legal conclusions reflected in the tax contingency reserve, "there is a supported and reasonable basis for the client's position" (AU 9326, ¶ 2.23).

In the case of Textron and TFC, the CPAs from E&Y who perform this analysis are E&Y tax partners and managers with tax expertise. During the meetings between TFC, Textron and E&Y to discuss the tax accrual workpapers, tax law issues were discussed, with references to tax statutes, tax regulations and rulings, and tax cases. The E&Y CPAs inform Textron whether they agree or disagree with the legal conclusions reflected in the Textron and TFC tax contingency reserves. On occasion, as a result of communications from E&Y regarding the tax contingency reserves, TFC and Textron have adjusted elements of the tax contingency reserves. Clearly, these communications constitute "tax advice" eligible for the Code § 7525 privilege.

Finally, the government contends that communications with an outside auditor regarding tax contingency reserves are not eligible for the Code § 7525 privilege because the communications are made in connection with the promotion of "tax shelters." This is not the case. As described above, the Code § 7525 "tax shelter" exclusion only applies to tax advice from a promoter that seeks to have the taxpayer enter into the transaction. As admitted in the Carmichael Declaration (paragraph 31), E&Y's tax advice and "judgments all relate to transactions that have already taken place" and, therefore, E&Y was not offering advice in connection with the promotion of any transaction. Further, as described above, the transactions reflected in the tax accrual workpapers are not "tax shelters."

**Conclusion**

For the reasons stated above, the government's Petition to Enforce the Internal Revenue Summons should be denied.

TEXTRON INC. AND SUBSIDIARIES
By their attorneys

/s/ John A. Tarantino

JOHN A. TARANTINO, #2586
PATRICIA K. ROCHA, #2793
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel: (401) 274-7200
Fax: (401) 351-4607

Dated: August 11, 2006

ARTHUR L. BAILEY
J. WALKER JOHNSON
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 429-3000
Fax: (202) 429-3902
*(admitted pro hac vice)*

*390143_1.doc*

CERTIFICATION

I certify that on this 11th day of August, 2006, I sent a true copy of the within Respondent, Textron Inc.'s Objection to Government's Petition to Enforce Internal Revenue Summons and Memorandum of Respondent, Textron Inc., in Opposition to Petitioner United States of America's Petition to Enforce Summons by Regular Mail to:

THOMAS P. COLE
JENNIFER D. AUCHTERLONIE
Trial Attorneys, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C. 2004

/s/ John A. Tarantino
JOHN A. TARANTINO, #2586
PATRICIA K. ROCHA, #2793
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel: (401) 274-7200
Fax: (401) 351-4607