UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Petitioner | : | |
| v. | : | C.A. No. 06-198T |
| TEXTRON, INC. and SUBSIDIARIES, | : | |
| Respondent | : | |

**AFFIDAVIT OF ROXANNE CASSIDY**

City of Providence )
)
State of Rhode Island )

I, Roxanne Cassidy, state that this affidavit correctly describes the facts relating to the creation of Textron Inc.'s 2001 tax accrual workpapers. This affidavit also correctly describes how these workpapers were used in connection with meetings with Textron Inc.'s independent auditors, Ernst & Young LLP.

**Employment at Textron Inc.**

1. I was employed by Textron Inc. between October, 1993 and July, 2004 when I resigned. During that time my job title was "Director, Tax Reporting." During 2001 and 2002 when the 2001 tax accrual workpapers were prepared, I reported to Norman Richter, who is and was then, the Vice President, Taxes at Textron Inc. It is my understanding that Mr. Richter is an attorney.

2. I am a licensed CPA. I received a B.A. from Providence College and a Masters of Taxation from Bryant University.

3. As the Director, Tax Reporting, I was responsible for Textron Inc.'s compliance with federal, state, and certain foreign tax reporting requirements. Such compliance involves the filing of federal, state, and foreign tax returns, the preparation of which I oversaw. It also involves compliance with SEC requirements for the reporting of tax matters to shareholders on applicable financial statements. In that regard, I was responsible for overseeing the preparation of files for Textron Inc.'s tax accrual workpapers. I was directly responsible for preparing the file for Textron Inc.'s tax reserve workpapers.

**Tax Reserve Workpapers**

4. The Textron Inc. 2001 tax accrual workpaper file contains a list of certain current issues raised by the IRS, and potential issues which the IRS might raise, where the correct tax treatment is uncertain in the opinion of Textron Inc. tax attorneys, plus information regarding the potential tax and interest associated with such issues. Next to each listed issue is a percentage. Such percentages reflect the attorneys' assessment of the chance Textron would prevail on the issue, if the issue was resolved in litigation with the IRS (a "hazards of litigation" assessment). Next to the hazards of litigation percentage was a tax contingency reserve amount that reflected the hazard percentage and the total value of the issue. At the bottom of the page was the total of all the tax contingency reserve amounts. This list of issues also includes a few issues that Textron expected to concede in full for various reasons (for example, because a court decision subsequent to filing the tax return might have resolved an open question in the tax law, or because Textron agreed to concede the issue during the prior examination cycle). For items such as these, the percentage was 100%. In all other cases, where the tax treatment was uncertain, the percentage was less than 100%.

5. I use the tax term "tax reserve workpapers" to describe the document that sets forth issues, litigation hazards percentages, and tax contingency reserve amounts described above in paragraph 4. The 2001 tax reserve workpapers file contains numerous other documents contained in the file for tax reserve workpapers. This information may provide additional detail, either break down or aggregate various amounts, or calculate interest. I call these "backup workpapers." Such documents, including various computations, backup the information set forth in the tax reserve workpapers and are listed on the privilege log.

**Creation of Tax Reserve Workpapers at Textron Inc.**

6. At Textron Inc. when I created tax reserve workpapers, I collected legal advice and conclusions from the attorneys in the Tax Department. During 2001 and 2002, the tax attorneys were, in addition to Mr. Richter who was head of the Tax Department, Sherman Drew, Marc Gerson, David Ruttenberg, Joe Stoeckle, and David Stonestreet. Their offices, like mine, were on the 20th floor at the Textron Inc. home office in Providence, Rhode Island.

7. The process began shortly before year-end, generally in October, when I circulated a cover letter with spreadsheet in a confidential envelope (to be opened by addressee only). The spreadsheet was the tax reserve workpapers for the prior year. The cover letter and prior year-end spreadsheet was sent to all tax attorneys and Edward Andrews, who was (and is) Director, Tax Audits. It was my understanding that Mr. Andrews is an accountant. This process was followed in connection with the preparation of the 2001 tax reserve workpapers.

8. I asked the attorneys to review the prior year's workpapers and identify changes to the workpapers, such as the addition of new issues with a litigation hazard percentage, the

removal of existing issue(s), or a change to the litigation hazard percentage for an existing issue. After I received a response from each attorney, I compiled that information into a draft worksheet for the current year and scheduled a meeting with the attorneys, including Mr. Richter and with Mr. Andrews, to review proposed changes.

9. At that meeting the attorneys collectively participated in a discussion of the merits of the tax reserve workpaper items on an issue-by-issue basis. Their discussion covered applicable statutes and other authorities including regulations, case authorities, and rulings which they had analyzed. The attorneys would express their legal opinions. Usually, a consensus developed as to the issues to include and the appropriate litigation hazard percentage. Mr. Andrews participated in this discussion providing his insights on the issues and factual information concerning the status of audits and the extent to which the issues discussed had a tax impact on open tax years (tax years where the statute of limitations or assessments of tax by the IRS had not expired).

10. After this meeting I revised the tax reserve workpapers and then scheduled a second meeting where I met with Mr. Richter to obtain his final approval of the revised workpapers.

11. Bates pages SUM00005 – SUM00007 is a copy of the tax reserve workpapers that I prepared after the meetings with the Textron Inc. attorneys and Mr. Richter. These are the workpapers that were discussed with our outside auditors, Ernst & Young LLP.

12. My role in the creation of the tax reserve workpapers was mostly as the collector of opinions and advice from Textron attorneys and the producer of the tax reserve workpapers themselves. I did not make substantive decisions about litigation hazards or whether the position on a particular issue was uncertain. These decisions were made by the attorneys. I did perform certain computational functions, such as the computation of accumulated interest and the total amount of tax attributable to an issue that was potentially due in more than one open tax year. These calculations are contained in the backup workpapers.

**Meeting with Ernst & Young LLP**

13. On January 18, 2002, a meeting was scheduled to review the tax reserve workpapers with Ernst & Young LLP, our outside auditors. From Ernst & Young LLP the tax engagement partners attended: Charlene Butler (from the Providence, Rhode Island office) and John McTigue (from the New York City office). It is my understanding that both individuals were CPAs. The audit engagement partner from Ernst & Young LLP may have attended the meeting. From Textron Inc., in addition to myself, all tax attorneys including the head of the Tax Department, Mr. Richter, plus Mr. Andrews attended. The meeting was scheduled at Textron offices and lasted about half a day.

14. At the meeting I handed out a copy of the tax reserve workpapers spreadsheet that I had prepared after meeting with the Textron attorneys. I reviewed the tax reserve schedule item-by-item, looking to the Textron attorneys to provide background and responses

when Ernst & Young LLP asked questions. The attorneys from Textron were present to answer questions and to participate in a substantive discussion of issues on the workpapers and the positions of the attorneys with respect to litigation hazards set forth in the workpapers.

15. The goal of the meeting was to obtain Ernst & Young LLP's approval of the total probable liability set forth in the tax reserve workpapers. The approval was usually expressed as their agreement that Textron Inc. was "adequately covered" or "adequately reserved." As Textron Inc.'s independent public accountants, such agreement had to represent the views of Ernst & Young LLP, applying the tax knowledge and experience of the Ernst & Young LLP tax partners.

16. At the end of this meeting I requested that the tax reserve workpapers be returned to me.

**Other Contacts with Textron Inc. Tax Attorneys**

17. During my employment in the Textron Inc. Tax Department, the discussions that the tax attorneys would have regarding hazards of litigation with respect to tax issues at Textron was not limited to meetings relating to the creation of tax reserve workpapers. I observed similar analysis and discussion by tax attorneys at Textron Inc. in connection with routine meetings to discuss tax issues presented in various transactions, routine meetings to review all disclosure rules and ensure that we were in compliance, and at weekly staff meetings. I also recall that tax attorneys would check with me to determine the amount set aside as a tax contingency in tax reserve workpapers when the settlement of an issue between IRS and Textron Inc. was under consideration.

**Inclusion of Tax Reserve in Financial Statements**

18. The total contingency amount set forth in the tax reserve workpapers for contingent taxes was combined by me with other long term tax liabilities (liabilities for taxes payable, tax refunds receivable, and audit payables) and the combined amount was given to Textron Inc. accountants for inclusion in the company's financial statements. In turn, that combined amount was combined with other non-tax long term liabilities and reported as "other liabilities" on Textron Inc.'s financial statements. The amount in the tax reserve workpapers, thus, was not separately reported to shareholders or the public on the Textron Inc. financial statements. Such amount cannot be discovered by reviewing Textron's financial statements or any other publicly available document.

**Expectation of Confidentiality**

19. I mentioned above that when I circulated the initial cover letter and spreadsheet to begin each year's creation of tax reserve workpapers I did so using a confidential envelope. When storing the files associated with the tax reserve workpapers, I stored the files in a locked drawer in my office. In sharing the workpapers with our outside auditors, I permitted them to review the workpapers at the meeting, but I asked for the return of the workpapers at the end of the meeting. I had the expectation that our outside auditors

would treat the information in confidence and have no reason to believe that they did not do so.

I, Roxanne Cassidy, declare under penalty of perjury that the foregoing is true and correct.

Executed on August 9, 2006.

Roxanne Cassidy

Signed and sworn to before me, a Notary Public, this 9th day of August, 2006.

My commission expires: 6/13/09.