UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Petitioner | : | |
| | : | |
| v. | : | C.A. No. 06-198T |
| | : | |
| TEXTRON, INC. and SUBSIDIARIES, | : | |
| | : | |
| Respondent | : | |

**<u>AFFIDAVIT OF DEBRA RAYMOND</u>**

City of Providence )
)
State of Rhode Island )

I, Debra Raymond, state that this affidavit correctly describes facts relating to the creation of tax accrual workpapers at Textron Financial Corporation ("TFC"). This affidavit also describes how these workpapers were used in connection with those meetings which I attended with TFC's independent auditors, Ernst & Young LLP ("E&Y").

**Employment at TFC**

1. TFC is a subsidiary of Textron Inc. It is a diversified commercial finance company providing lending and related services in a variety of industries. Because TFC issues debt instruments to investors, TFC has its own credit rating and publishes its own financial statements.

2. I am currently employed by TFC in the capacity of Vice President, Taxes. I held the following positions in TFC's Tax Department prior to becoming Vice President, Taxes on April 1, 2004. I was Vice President, Tax Compliance and Reporting, a position I obtained in May 2002. Prior to May 2002, I was Senior Tax Manager, as well as Federal Tax Manager. All of these positions were at TFC. In 2001 and 2002, as Senior Tax Manager, I was assigned to TFC's federal tax matters, and was responsible for creating and maintaining TFC's tax accrual workpapers. I have been a licensed CPA since June 19, 1991.

3. TFC has a tax group, the manager of which is the Vice President, Taxes, the position I now hold. In 2001 and 2002, when the 2001 tax accrual workpapers were created, that

position was held by Kathleen Smith. It is my understanding that during 2001 and 2002 Kathleen Smith was a licensed CPA.

4. As the current Vice President, Taxes, I have a "dual" reporting responsibility. The position reports "operationally" to TFC's Chief Financial Officer ("CFO"). TFC's CFO reports to TFC's President and to Textron's CFO. TFC's Vice President, Taxes, also reports "functionally" to Textron's Vice President, Taxes. It is my understanding that in 2001 and 2002, when the 2001 tax accrual workpapers were created, reporting lines for TFC's Vice President, Taxes were the same as they are today.

5. During 2001 and 2002, the TFC tax group included approximately 20 tax professionals who were responsible for the preparation of federal, state, local tax returns and for managing the preparation of some foreign tax returns. The TFC tax group did not include any tax attorneys.

6. The TFC tax group generally relied on guidance from outside tax advisors from either public accounting firms or law firms on technical tax matters related to complex transactions, including the nine 2001 leveraged lease transactions. The TFC tax group also relied on the advice of the tax attorneys at Textron Inc. One tax attorney at Textron Inc. was assigned to TFC. During 2001 and 2002, when the 2001 tax accrual workpapers were created, that attorney was Joseph Stoeckle.

**TFC's Tax Accrual Workpapers**

7. The term "tax accrual workpapers" as used here, refers to the spreadsheet(s) (electronic and paper) created and assembled by the TFC tax group, that contain a list of possible tax issues, hazards of litigation percentages, and tax reserve amounts. These are spreadsheet(s) that the TFC tax group uses in its annual meeting with E&Y. There are many other back-up documents and documents that contain various computations that are incident or support the tax accrual workpapers themselves. I will call these "backup workpapers."

8. The 2001 tax accrual workpapers contain a list of issues with respect to which TFC and Textron Inc. concluded that the correct tax treatment is uncertain and for which reserves for contingent taxes were warranted. In addition to a list of issues, the TFC tax accrual workpapers contain litigation hazard percentages for each listed issue and a corresponding reserve for contingent taxes. A total reserve for contingent taxes for all listed issues is also set forth in the tax accrual workpapers.

**Creation of 2001 Tax Accrual Workpapers at TFC**

9. The 2001 tax accrual workpapers were prepared by me with input from other members of the TFC tax group and under the supervision of the head of the Tax Department at TFC, and with guidance, on legal matters, including litigation hazard percentages, from the Textron Inc. tax attorney, Mr. Stoeckle.

10. The process would start before the end of the year for which tax accrual workpapers were being created. Starting with the tax accrual workpapers for the prior year, I and others

members of the TFC tax group made adjustments to reflect developments during the current year based on (a) input from Textron Inc. tax attorney, Mr. Stoeckle, who advised the TFC tax group, and the Vice President, Taxes (TFC) to whom I reported (b) where applicable, tax advice from outside counsel, and (c) my own knowledge of developments in my area of responsibility.

11. After I created the preliminary tax accrual workpapers, I would meet with the Vice President, Taxes (TFC) Kathleen Smith. We would discuss the proposed tax reserves and possibly required changes.

12. Kathleen Smith and I then reviewed the tax accrual workpapers with Mr. Stoeckle and Roxanne Cassidy, Director, Tax Reporting of Textron, Inc. Mr. Stoeckle advised us regarding the issues, the litigation hazard percentages, and the tax reserve amounts. I understood that Mr. Stoeckle was acting in his capacity as tax attorney for Textron Inc. and, by virtue of his assignment as TFC tax counsel, as tax attorney for TFC. At this meeting, we would defer to Mr. Stoeckle judgments as an attorney as to the appropriate amount of TFC's litigation hazard assessment.

**Meeting with Ernst & Young LLP**

13. TFC's outside auditor is E&Y. Tax partners from the E&Y Boston, Massachusetts office, which specializes in audits of financial services companies, were assigned to the audit team for TFC. To the best of my memory, the E&Y tax partner, William Earon, was involved in the review of the 2001 tax accrual workpapers. A Senior Tax Manager from E&Y, Tom Oswald, may also have been involved in the review of the tax accrual workpapers for 2001.

14. As the head of the TFC Tax Department, Kathleen Smith scheduled the meeting with E&Y to review the 2001 tax accrual workpapers. Kathleen Smith and I represented TFC at that meeting. During that meeting, we reviewed and discussed the already identified or potential tax issues, the litigation hazard percentages, and the resulting reserve amounts. The discussion included substantive discussion of tax issues, authorities, and the opinions of the participants to the meeting.

15. Copies of the tax accrual workpapers (containing the list of issues, hazards of litigation percentages, and resulting tax reserve amounts) were made available during the meeting. We allowed the E&Y representatives to review the workpapers, but requested that they not take copies with them. At the conclusion of this meeting, the E&Y partners concluded that TFC's tax reserves for contingent taxes were adequate.

16. Recently, I had occasion to review the E&Y files for 2001 and determined that they did not include a copy of our tax accrual workpapers for 2001.

17. I have provided TFC's tax accrual workpapers to attorneys from Steptoe & Johnson LLP, the firm representing Textron Inc. and TFC in the matter relating to the summons enforcement proceeding initiated by the government. They have created a privilege log which contains references to Bates stamped copies of these files. I have reviewed the documents listed therein and note that there are multiple copies, i.e., revised or updated

versions, of the 2001 workpapers and that there are various differences in the tax reserve amounts set forth in such copies or versions. However, this is not unexpected since the workpapers are reviewed and revised to reflect comments of Textron Inc. attorneys and others at TFC, as well as corrections.

18. There is one set of tax accrual workpapers marked "final/revised" which I believe is the set of tax accrual workpapers for 2001 that we reviewed with E&Y in the above noted meeting. Bates stamp p. 00465. I was unable to confirm that this was the copy used in the E&Y meeting, but I believe it is highly likely that such workpapers were the final set and the object of the review with E&Y at the above noted meeting (See para.16 and 17).

**Inclusion of Tax Reserve in Financial Statement**

19. As it is typical for other types of loss contingencies, TFC's 2001 reserve for contingent tax liabilities (that is, the total reserve amount shown on the tax accrual workpapers) was never reported in any identifiable manner on any financial statement , but instead was aggregated with other tax accruals and then further combined with other non-tax liabilities in manner to preserve confidentiality. During the preparation of TFC's separate company audited financial statements for 2001, it was included in the line for "accrued interest and other liabilities" on the balance sheet.

**Expectation of Confidentiality**

20. At all times I had an expectation that E&Y would respect the confidentiality of the information contained in TFC's tax accrual workpapers which they reviewed and I have no reason to believe they did not do so. I believe both TFC and Textron Inc. employees who had access to this information also treated it in confidence.

I, Debra Raymond, declare under penalty of perjury that the foregoing is true and correct.

Executed on August 9, 2006.

Debra Raymond [signature]

Debra Raymond

Signed and sworn to before me, Patricia E. D'Ambrosio a Notary ~~Public~~, this 9th day of August, 2006.

[signature]

My commission expires: 6/26/09.