UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Petitioner | : | |
| | : | |
| v. | : | C.A. No. 06-198T |
| | : | |
| TEXTRON INC. and SUBSIDIARIES, | : | |
| | : | |
| Respondent | : | |

## AFFIDAVIT OF NORMAN RICHTER

City of Providence )
)
State of Rhode Island )

I, Norman Richter, state that this affidavit correctly describes the facts relating to the tax accrual workpapers at Textron Inc. and Textron Financial Corporation (TFC). It also correctly describes how these workpapers were used in connection with meetings with our auditors, Ernst & Young LLP.

### Employment at Textron Inc.

1. I began work at Textron Inc. in 1995 when I became the Director of Tax Planning and Senior Tax Counsel. From 1997 to 2000, I was Assistant Treasurer. In June 2000, I became Vice President, Taxes. In my current position, I am responsible for tax matters for Textron Inc. and its subsidiaries, including TFC. TFC has its own tax group that reports functionally to me through the Vice President, Taxes of TFC, currently Debra Raymond.

2. As the Vice President, Taxes for Textron Inc., I manage the Textron Tax Department and I report to the CFO of Textron Inc. Because I am responsible for providing legal advice, managing any tax litigation that may arise, and working out settlements with the IRS either prior to or during litigation, I also am accountable to Textron's General Counsel. Textron's Legal Department does not have a tax counsel. I provide that function through my position as Vice President, Taxes, along with tax attorneys on my staff. I am also responsible for managing and settling issues that are brought to IRS Appeals, where hazards of litigation analysis is taken into account both by Textron and the IRS in developing settlement strategy and results.

3. I am an attorney and a member in good standing of the District of Columbia Bar . In accordance with Rhode Island rules with respect to the practice of law, I have registered with the Rhode Island courts and satisfy applicable requirements in Rhode Island such as continuing legal education.

**Organization of the Tax Function at Textron Inc. and TFC**

4. The Tax Department at Textron Inc. and TFC is responsible for (1) compliance with applicable tax laws (federal, state and local, and foreign) and (2) reporting tax matters on financial statements filed with the SEC and other regulators; (3) defense of Textron Inc.'s tax positions during audits of tax returns by IRS and other tax authorities; and 3) tax advice and planning for the company.

5. At Textron Inc., these responsibilities are primarily accomplished through a Director, Tax Reporting (responsible for filing tax returns and reporting tax matters in financial statements), a Director, Tax Audits (responsible for administration of audits of tax returns by IRS and other tax authorities) and a group of tax attorneys who provide legal advice to me, our clients within Textron Inc., the Director of Tax Reporting and the Director of Audits. One tax attorney is assigned as the tax advisor to TFC. It is a requirement at Textron Inc. that all tax attorneys be members in good standing of the bar in their applicable state and comply with Rhode Island practice requirements, and it is my understanding that all tax attorneys in the Tax Department satisfy these requirements.

6. During the applicable period (2001 and 2002), the Director of Tax Reporting was Roxanne Cassidy. The Director of Tax Audits was Edward Andrews. The tax attorneys were Joseph Stoeckle, David Ruttenberg, David Stonestreet, Sherman Drew and Marc Gerson. The tax attorney assigned to TFC was Joseph Stoeckle.

**Tax Accrual Workpapers**

7. The IRS summons requests that Textron Inc. produce the tax accrual workpapers for Textron Inc., as well as the tax accrual workpapers for TFC, for the year 2001. The paragraphs below explain why we prepare tax accrual workpapers.

8. I mentioned above that the Tax Department at Textron Inc. is responsible for reporting tax matters in tax returns filed with tax authorities such as the IRS and in financial statements filed with the SEC. The same is true for TFC. The rules for reporting taxes to the IRS and to the SEC are different. In reporting taxes to the IRS we follow tax and tax accounting rules; in reporting taxes to the SEC we follow Generally Accepted Accounting Principles (GAAP).

9. These two reporting systems (tax and GAAP) differ in important respects. For purposes of filing tax returns with the IRS, we report taxes on the basis of the tax positions that we conclude are supported by the published tax law. If there is an item where in the view of our tax attorneys the tax position is uncertain, we file our returns on the basis of the position we believe is correct, even though the IRS may dispute that position. If a dispute later arises and we contest the IRS position, payment of the disputed tax would normally be deferred until the dispute is resolved. In contrast, for GAAP purposes, disputed taxes

and potentially disputed taxes are taken into account currently (that is, in the period when the circumstances occur that relate to the tax position, usually prior to the filing of the tax return), subject to an analysis that includes an analysis of how likely the disputed tax will be resolved in IRS' favor and paid.

10. Thus, to comply with GAAP, we are obliged to estimate the likelihood that we may eventually owe additional taxes and then to establish a reserve for such contingent taxes in the accounting books. In calculating income and our balance sheet liabilities for GAAP purposes, the company accrues a reserve for contingent taxes which takes into account our legal assessment of the hazards of litigation for a disputed issue. The hazards analysis is a function performed by tax attorneys in the Tax Department at Textron Inc.

11. At Textron Inc. and TFC, the tax accrual workpapers are prepared by employees at Textron Inc. and TFC and not by our outside auditors, Ernst & Young LLP. As part of their auditing function, Ernst & Young LLP tax partners review our tax accrual workpapers and determine whether they believe the company's accruals are adequate and appropriate. Based on meetings that I have attended involving the review by Ernst & Young LLP of our tax accrual workpapers, I am aware that in conducting their review Ernst & Young LLP tax partners draw on their knowledge and experience in tax matters when arriving at their conclusions about the adequacy of our reserves for contingent taxes. It is also my understanding that the accounting firm's approval of our reserve for contingent taxes is and must be based on the firm's tax partners' developing their own opinion of whether our tax reserves are appropriate. They do not base that approval simply on the fact that Textron Inc. believes the reserves are adequate. In fact, there have been occasions when Ernst & Young LLP's review has caused the firm's tax partners to suggest a higher or lower reserve amount was appropriate based on their interpretation of the statutes, regulations, case law and rulings applicable to a tax issue. On these occasions, after further analysis, we have sometimes adjusted the reserve accordingly.

**Textron Inc. and TFC Tax Accrual Workpapers**

12. I have read the affidavits of Roxanne Cassidy and Debra Raymond describing the creation of the tax accrual workpapers for 2001 at Textron Inc. and at TFC and their understanding of the facts is consistent with my understanding. I add the following comments:

13. With respect to Textron Inc., the tax accrual workpapers reflect two legal conclusions of the attorneys in the Textron Inc. Tax Department. The first is the identification of issues where the correct tax treatment may be uncertain. The listing of an issue in the tax accrual workpapers reflects a conclusion reached by the attorneys that the correct legal analysis of the tax law, as applied to that issue, is in doubt or uncertain--- taking into account statutes, regulations, rulings and applicable precedent. The second attorney legal conclusion is reflected in the hazard of litigation percentage which is listed next to each identified issue. This percentage reflects the attorneys' legal assessment of the likelihood that the IRS might not prevail in court. When an issue has not been raised by IRS, in keeping with accounting guidelines, the litigation hazard percentage is not "discounted"

to reflect the likelihood that the IRS will identify the issue and assert an adverse position. The hazard analysis is also reflected in a tax reserve amount reported on the tax accrual workpapers, such amount being computed by multiplying the hazard percentage times the total value of the issue.

14. When attorneys in the Textron Tax Department conclude that the tax treatment for an item is "uncertain," it means only that there is a risk that the IRS may prevail on a contrary position in court, assuming the issue is not otherwise resolved, such as by settlement. Given the complexity of the tax Code, it would be very unusual for a large taxpayer like Textron to have no items with "uncertain" tax treatment and, thus, no reserves for contingent taxes. In my experience, the presence of a reserve for contingent taxes in a company's financial statements is a benign event and not an indicator that a taxpayer intentionally disregards known tax rules.

15. I have read the Supreme Court opinion in Arthur Young where the Court (fn. 9) described the routine tax questions that might give rise to an entry in a taxpayer's tax accrual workpapers. The Court stated:

> For example, the characterization of the proceeds of a sale as capital gain instead of ordinary income, the claiming of an investment tax credit, and the attribution of a transaction to a future tax year are decisions requiring judgment calls in grey areas of the Code, any one of which might result in a re-computation of the corporations outstanding tax liability.

I agree that these types of routine tax questions, and not questions relating to tax shelters or listed transactions, are the types of questions that typically give rise to entries in tax accrual workpapers.

16. In the case of TFC, the tax accrual workpapers reflect the conclusions of attorneys at Textron Inc., namely Mr. Stoeckle who worked in the Textron Inc. Tax Department and was assigned to give tax advice to the TFC tax group, and me. My conclusions are reflected since I meet either with the Vice President Taxes for TFC and review the preliminary tax accrual workpapers around the time that TFC meets with the outside auditors, Ernst & Young LLP or with the attorney assigned to TFC with whom I would meet regularly. At such meetings, I review, ask questions, discuss the content of any outside legal opinions that TFC may have obtained, and ultimately indicate my agreement with the analysis presented in the TFC tax accrual workpapers.

17. The hazard of litigation analysis for TFC tax issues also reflects the legal analysis and conclusions of outside law firms that advise TFC on new investments and activities.

18. Tax attorneys at Textron Inc. routinely provide tax advice with respect to matters under consideration by Textron Inc and TFC. It is not uncommon for attorneys to provide a hazards of litigation analysis or assessment, and such advice is not limited to giving advice in connection with the preparation of the tax accrual workpapers. For example, such advice is given in connection with evaluating tax issues presented by proposed acquisitions and dispositions of assets, proposed dividends from foreign subsidiaries, and

proposed research and development projects. We are always aware that to the extent that tax issues are present, the IRS may challenge the positions that we take and, in that event, we will need to defend our positions. For example, for the tax years 1987 to 1992, the IRS raised several tax issues and Textron defended its position on those issues in litigation in the United States Tax Court. Textron successfully appealed the Tax Court's decision on one issue to the First Circuit. Textron Inc v. Commissioner of Internal Revenue, 92 AFTR 2d 2003-5373 (1st. Cir. 2003). The hazards of litigation assessments that we made for those issues helped us make litigation decisions. All of our hazards of litigation determinations reflect our understanding that litigation of the issues is a reasonable prospect.

19. I have reviewed the Carmichael declaration submitted by the government in support of its Petition. Mr. Carmichael incorrectly describes the creation of tax accrual workpapers, at least in Textron's case, when he states (pg. 8) that the tax accrual workpapers are prepared by the company's own tax accountants. I assume this does not refer to the company's independent auditor, since it is my understanding that it is inappropriate for the independent auditor to prepare the accounts that it must review, which would put it in the position of auditing its own work. Most importantly, at Textron Inc. and TFC, while internal accountants and CPAs are involved in assembling and recording matters on those documents, the conclusions stated in the tax accrual workpapers are the conclusions of the attorneys, not the accountants. Also, the hazards of litigation assessment represents the conclusion of the attorneys, on which management relies.

20. My experience in meeting with the outside accountants when they review our tax accrual workpapers is that the auditors, particularly the Ernst & Young LLP tax partners present, apply their own knowledge and experience as tax professionals to arrive at the judgment concerning the adequacy and appropriateness of the tax reserve. The Carmichael declaration (paragraphs 21, 27, 28, 29) confirms that the auditors base their approval on their analysis and judgment of the merits of the tax positions taken by the company, taking into account their knowledge and experience in tax matters as CPAs.

**Textron Response to IRS Information Requests**

21. Large corporations, like Textron, are subject to IRS audit of the federal income tax returns filed for every year. This is normal practice at the IRS. Typically, IRS audits the returns for two or more tax years as part of a single examination. In connection with such examination, Textron responds to hundreds of information requests made by the IRS examination team. Textron responds to all requests that seek factual information relating to our returns. In connection with the examination that included the request for tax accrual workpapers, we responded to over 500 information requests seeking factual information. At this point, all IRS information requests have been closed out with the exception of the one seeking the tax accrual workpapers that is the subject of the government's petition to enforce the IRS summons at issue in these proceedings.

22. In not providing the documents requested by the Internal Revenue Service, Textron Inc. and TFC claim attorney-client privilege, the accountant-client privilege provided by statute in section 7525 of the Internal Revenue Code, and work product protection,

including attorney work product protection as provided for in Rule 26(b)(3) of the Federal Rules of Civil Procedure, and as otherwise recognized by the federal courts.

**Textron Position Regarding Listed Transactions**

23. After the IRS commenced (in 2002) its new policy of "listing" transactions that it considered to be inappropriate tax positions, I and the tax attorneys in my department annually reviewed all transactions and tax positions to determine that the company had not engaged and did not contemplate engaging in any listed transaction. It was my policy as the chief tax officer of Textron that the company would not engage in any listed transactions. When TFC entered into the so called SILO transactions in 2001, it was on the basis that these transactions fully complied with the tax laws and I had no expectation that these transactions would subsequently (more than 4 years later in February 2005) become "listed transactions." Textron attorneys and TFC continue to believe that TFC's tax treatment of these transactions was in full compliance with the tax laws as then in existence, including the IRS's leveraged lease guidelines and the requirements by the case law applicable to leveraged leases. I expect that this belief will be borne out when the IRS tax treatment of SILOs is ultimately tested in the courts. In response to an inquiry from the IRS, we informed the IRS that Textron and TFC had engaged in no listed transactions other than the so-called SILO transactions.

I, Norman Richter, declare under penalty of perjury that the foregoing is true and correct.

Executed on August 9, 2006.

Norman Richter

Signed and sworn to before me, a Notary Public, this 9th day of August, 2006.

My commission expires: April 20, 2007.

Mary E. Harrop, Notary Public

Mary E. Harrop, Notary Public
Commission Expires April 20, 2007