IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Petitioner, | ) | |
| v. | ) | Civil No. 06-198 |
| TEXTRON INC. and SUBSIDIARIES, | ) | |
| Respondent. | ) | |

**UNITED STATES' REPLY TO RESPONDENT'S OPPOSITION TO PETITION TO ENFORCE SUMMONS**

A. The Tax Accrual Workpapers Are Not Protected Work Product.

*1. Respondent's Tax Accrual Workpapers Are Not Protected by the Work-Product Doctrine Because They Would Have Been Created and Were Required to Have Been Created In Any Event.*

Respondent attempts to distinguish Arthur Young, the Supreme Court case upholding the IRS's right to obtain tax accrual workpapers, by arguing that the tax accrual workpapers in its possession, created in-house, are different from the tax accrual workpapers an independent auditor created. Respondent acknowledges, however, that as a publicly traded company, it is required to publicly file audited financial statements, and in those statements account for uncertain tax positions in a tax reserve account. Richter Aff. ¶¶ 8-10; Carmichael Decl.¶ 22. Respondent also acknowledges that workpapers created in-house are part of the materials reviewed, discussed and/or available to respondent's independent auditor, E&Y, as part of E&Y's audit of respondent's public financial statements. Weston Aff. ¶ 2; see also Carmichael Decl. ¶¶ 18-21. As part of that audit, E&Y must satisfy itself that the tax reserves properly reflect the dollar amount of the potential future tax liabilities; otherwise it cannot provide an "unqualified" opinion. Carmichael Decl. ¶ ¶ 19, 24, 26-28.

Respondent's in-house tax accrual workpapers are not entitled to work product protection because the workpapers would have been prepared, even in the absence of the prospect of

litigation, to comply with respondent's public reporting requirements. Public corporations are required under securities laws both to publicly file their financial statements, and to have those financial statements audited by independent auditors. United States v. Arthur Young & Co., 465 U.S. 805, 810-11, n.5-6 (1984) (citing laws that "require publicly held corporations to file their financial statements," and requiring that such statements "be audited by an independent certified public accountant in accordance with generally accepted auditing standards"). Independent auditors, in turn, must review a company's tax accrual workpapers to reach their own conclusions as to the sufficiency of the company's tax reserves. Id. at 812-13; United States v. El Paso Co., 682 F.2d 530, 534 (5th Cir. 1982) ("To comply with the securities laws, companies such as El Paso *must* prepare in-house or have prepared by outside auditors an analysis of their contingent tax liabilities."); see also Carmichael Decl. ¶¶ 20-24, 26.[1]

The work product doctrine does not protect "[m]aterials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes." Advisory Committee Note, Rule 26, Fed. R. Civ. P. Both the "ordinary course of business" and "pursuant to public requirements" exclusions to the work product doctrine remain vibrant. This important proposition is embraced, not overruled, by courts adopting the "because of" test for determining whether purported work product was created "in anticipation of litigation." The "because of" test excludes from protection "documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation." United States v. Adlman, 134 F.3d 1194, 1202 (2d Cir. 1998). Adopting Adlman's "because of" test, the First Circuit likewise stated that work product protection was not available to documents that were "prepared in the ordinary course of business

[1] With respect to respondent's contention that the actual tax reserve figure is not contained on the publicly financial statements as a stand-alone figure, that does not change the fact that an independent auditor must review the tax reserve and be satisfied that it is appropriate. See Supplemental Carmichael Decl. ¶¶ 3-5.

or...would have been created in essentially similar form irrespective of litigation." Maine v. United States Dep't of the Int., 298 F.3d 60, 70 (1st Cir. 2002) (quoting Adlman).

Adlman involved "a study prepared for an attorney assessing the likely result of an expected litigation. . .." Adlman, 134 F.3d at 1195.[2] The court concluded that even "if the primary or ultimate purpose of making the study was to assess the desirability of a business transaction, which, if undertaken, would give rise to the litigation[,]" it was nevertheless protected because the document was prepared because of litigation. The court concluded that the study would not have been prepared in its current form but for the prospect of litigation, but nevertheless remanded the issue with instructions that the district court decide whether "substantially the same [document] would have been prepared in any event–as part of the ordinary course of business of restructuring." Id. at 1204.[3] The court gave no indication that the document was prepared to comply with public requirements. In light of the court's statement that documents prepared either in the ordinary course of business or to comply with public requirements would not be protected, there is no basis to read Adlman, as respondent apparently does, as overriding or inconsistent with either of these exceptions to work product protection.[4]

Maine involved documents a government agency created in the process of adding a species to an endangered species list. Letting stand a ruling that the documents were not entitled

---

[2] The Second Circuit's dicta in Adlman considers several hypothetical scenarios under which documents were created, one of which involved an independent auditor's request for a memorandum prepared by a company's attorneys estimating the likelihood of success in litigation. Adlman, 134 F.3d at 1200 (example (iii)). The Second Circuit's dicta suggests that such a memo would be entitled to work product protection. However, the dicta does not indicate whether the analysis was generated under legal or other public requirements. To the extent that the Second Circuit's example is read to include tax accrual workpapers, rather than the "study" to which it refers in its example, the dicta would be at odds with Arthur Young and inconsistent with its own opinion.

[3] Indeed, the Court found that "[l]itigation was virtually certain to result from the reorganization and Sequa's consequent claim of tax losses." Adlman, 134 F.3d at 1196.

[4] Furthermore, Adlman disagreed (as we do) with cases (like those cited in the respondent's brief at 10) that hold work product protection is available even if a document is legally required to be created. Specifically, the Adlman Court stated that it did "not necessarily concur with the holding" in Special September 1978 Grand Jury, 640 F.2d 49 (7th Cir. 1980), "[s]ince the documents at issue were required to be prepared under Illinois law, it is arguable that they were not prepared 'because of' litigation." Adlman, 134 F.3d at 201 n.5.

to work product protection, the First Circuit found that the *Vaughn* index produced by the party seeking to invoke the work product doctrine contained "insufficient descriptions" to determine whether they "were prepared in the ordinary course of business or ... would have been created in essentially similar form irrespective of the litigation." Maine, 298 F.3d at 70.[5] Absent such evidence by the person asserting the privilege, a claim of work product protection will fail.

An independent auditor, carrying out the duties required under generally accepted accounting principles when auditing a public company's financial statements, must have access to the tax accrual workpapers prepared by or for a company. Carmichael Decl. ¶ 20. Because they are created in any event, a public company's tax accrual workpapers are not entitled to protection under the work product doctrine. Respondent offers statements of various corporate officers to support its privilege claims. Not one of the officers states that respondent prepared the tax accrual workpapers for any reason other than to prepare its public financial statements. Respondent did not even assert, let alone prove, that the tax accrual workpapers would not have been prepared absent its public reporting requirements.[6] The absence of such statements is, as it was in Maine, fatal to respondent's claim of work product protection.

The Fifth Circuit, in El Paso, rejected the argument that respondent makes here.[7] The El

[5] There is also no evidence that the risk management documents discussed in Simon v. G.D. Sealre & Co., 816 F.2d 397 (8th Cir. 1987) (Resp't Br. at 9), were required by public requirements. According to the court, defendant established the reserves to anticipate legal expenses and to self-insure. Id. at 399. There is no mention of any public requirements.

[6] Even more, Textron, unlike the taxpayer in Adlman, does not even say that the evaluation of the adequacy of its reserves was provided in anticipation of litigation over the issues which it reserved. Rather, Textron merely states that the information provided in evaluating the reserves also proved useful in making litigation decisions at a later time and that Textron is always aware of the potential for litigation. Richter Aff. ¶ 18. If the "anticipation of litigation" standard is that wide, it swallows all business decisions, and all business documents are protected in all litigation from discovery. No court has held that to be the case. Moreover, throughout its papers, Textron makes a distinction between the 2001 audit and the 2005 announcement concerning the SILOS, as if it was unaware of any potential for litigation with the listed transactions until the 2005 IRS announcement. Textron's contention that it was unaware of any potential problems with the transactions until 2005 is inconsistent with "anticipation of litigation" in 2001. Respondent failed to establish that the documents satisfy the requirements of protected work product.

[7] The El Paso court referred to the "tax-pool analysis," stating "[n]o matter what alias is used, the documents are of a similar nature." El Paso, 682 F.2d at 533. For the many names given tax accrual workpapers, see the Vasconcellos Decl. at ¶ 5.

Paso decision remains important not because of its formulation of whether a document was prepared "in anticipation of litigation," which is admittedly different from Adlman's, but because it provides the context of how tax accrual workpapers fit into the doctrine's exclusions, even under the Adlman formulation of the test. The Fifth Circuit noted that "materials assembled in the ordinary course of business or pursuant to public requirements" are "[e]xcluded from work product materials" because they are not "assembled and brought into being in anticipation of litigation." El Paso, 682 F.2d at 542. Reviewing the circumstances under which the tax pool analysis documents were created, the Fifth Circuit said that "the tax pool analysis does not contemplate litigation in the sense required to bring it within the work product doctrine." Id. at 544. The court found both that the documents were prepared in the ordinary course of business ("the tax pool analysis carries much more the aura of daily business than it does of courtroom combat") and that the taxpayer was publicly required to create the documents (the creation of the tax pool account was "compelled by securities laws," and that the tax pool analysis was "[w]ritten ultimately to comply with SEC regulations"). Id. at 543. Thus, the Fifth Circuit concluded that both exclusions to the work product doctrine applied – the documents were created in the ordinary course of business and were publicly required to be created.[8]

Respondent argues (Resp't Br. pp. 7-8, n. 3) for the inapplicability of El Paso on the grounds that the Fifth Circuit applies the "primary motivating purpose" test and not the broader "because of test" when determining whether a document was created in anticipation of litigation, and suggests (at p. 11) that the reason the Fifth Circuit ordered the production of documents was because they did not meet the heightened "primacy" test. However, As we demonstrated above, it does not matter which test is used: both tests retain the "ordinary course of business" and

[8] The El Paso court noted that "the tax pool analysis may be performed either in house or by outside accountants. El Paso happens to prepare its own tax pool analysis, but many firms retain outside accountants to accomplish that task." Id. at 534.

"publicly required to have been prepared" exclusions. Further, contrary to respondent's contention that Adlman and Maine allow this Court to ignore El Paso in its entirety, the "public requirements unrelated to litigation" exclusion to work product protection is alive and well in the First Circuit. See In re Raytheon Sec. Litig., 218 F.R.D. 354, 359 (D. Mass. 2003) ("This exclusion from work product protection of materials assembled pursuant to public requirements unrelated to litigation applies even if the party is aware that the document may also be useful in the event of litigation") (internal quotation marks omitted).

*2. Disclosure Precludes Work Product Protection.*

At all events, even if the tax accrual workpapers are otherwise protected work product, any protection they had was waived when respondent shared the documents and/or their contents with the independent auditors. See United States v. Mass. Inst. of Tech, 129 F.3d 681, 688 (1st Cir. 1997) (finding that MIT's disclosure of confidential documents to the Defense Contract Audit Agency, its outside auditor for certain grants and contracts, waived work product protection of the documents sought by Internal Revenue Summons).[9] Respondent attempts to dodge this fatal bullet by suggesting that: a) it did not actually show all its workpapers to E&Y. (Cassidy Aff. ¶¶13-14; Raymond Aff. ¶ 15); b) it buried its tax reserve on its public financial statements so investors could not find this information (Cassidy Aff. ¶ 18); and c) E&Y would disregard its role as its independent auditor and was obligated to keep this information confidential (Cassidy Aff. ¶ 19). Respondent's attempts fail.

Respondent admits that it discussed the contents of the tax accrual workpapers with

[9] While courts in other jurisdictions may hold that disclosure to a third party does not necessarily waive work product protection (see Resp't Br. at 12-14), such cases have no application here as the First Circuit has held otherwise. MIT, 129 F.3d at 687 ("MIT's disclosure to the audit agency was a disclosure to a potential adversary."). In any event, we submit that those other cases are wrongly decided.

The First Circuit also rejected the contention that the third party's obligation to keep information confidential somehow prevented or cured a waiver. Id. at 683, 686 (DCAA's regulations and practices offered MIT some basis to think its information would not be disclosed; nevertheless, the disclosure was a waiver).

E&Y. Cassidy Aff. ¶¶13-14; Raymond Aff. ¶ 15. Respondent is obligated to submit audited financial statements to the SEC and the public. Even if respondent has managed to bury its tax reserve amount in its publicly filed financial statements, it undeniably had to share that information with E&Y. Supplemental Carmichael Decl. ¶¶ 3-5. An independent auditor could not provide an unqualified opinion on the financial statements without reviewing the information and satisfying itself that the financial statements, including the amount reserved, were a fair reflection of the respondent's financial condition. Carmichael Decl. ¶20. Because E&Y, in providing an opinion on respondent's financial statements, is in the role of an independent auditor, there was and is no basis on which respondent or its officers could have assumed that information provided to E&Y remained privileged or protected. E&Y's independent auditor status is per se inconsistent with a privileged relationship.[10] As stated in Arthur Young, 465 U.S. at 818:

> Nor do we find persuasive the argument that a work-product immunity for accountants' tax accrual workpapers is a fitting analogue to the attorney work-product doctrine established in Hickman v. Taylor, 329 U.S. 495, 67 S. Ct. 385, 91 L.Ed.2d 451 (1947). The Hickman work-product doctrine was founded upon the private attorney's role as the client's confidential advisor and advocate, a loyal representative whose duty it is to present the client's case in the most favorable possible light. An independent certified public accountant performs a different role. By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility transcending any employment relationship with the client. The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public. This "public watchdog" function demands that the accountant maintain total independence from the client at all times and requires complete

[10] Respondent states that when E&Y, as its independent auditor, reviewed its tax reserves, that review was done by a "tax partner." If true, the Tax Partner was working for and as an agent of the Audit Partner, as any other arrangement would preclude E&Y from providing an unqualified opinion of the financial statements. The Weston Affidavit, the only affidavit of someone from E&Y, identifies only one role of E&Y as relevant to this proceeding, that of independent auditor. Weston Aff. ¶ 1. Morever, the affidavits respondent offered do not (and could not) state that E&Y was providing "tax advice" with respect to the items in or the amount of the tax reserves, since such a role is inherently in conflict with E&Y's role of independent auditor. Lastly, even if a tax partner had been retained to offer advice for a specific transaction (and there is no evidence of this), a waiver nevertheless occurred when the tax accrual workpapers were shown to members of the audit team in their capacity as independent auditors.

> fidelity to the public trust. To insulate from disclosure a certified public accountant's interpretations of the client's financial statements would be to ignore the significance of the accountant's role as a disinterested analyst charged with public obligations.

Further, the Court understood that "[t]he auditor will also obtain and assess the opinions, speculations, and projections of management with regard to unclear, aggressive, or questionable tax positions that may have been taken on prior tax returns," 465 U.S. at 812, when it enforced the IRS summons. Thus, statements about the significance of auditor independence apply no less to information created by the corporation and disclosed to the auditor.

B. The Tax Accrual Workpapers are not protected by the Attorney-Client Privilege or the I.R.C. § 7525 Tax Practitioner Privilege.

*1. The Tax Accrual Workpapers Do Not Constitute Privileged Legal or Tax Advice.*

Respondent creates its tax accrual workpapers to establish and evaluate the adequacy of the financial statement's tax reserve. The creation of the tax accrual workpapers is an accounting function, not a legal one. Carmichael Decl. ¶ 23 ("Management's tax accrual workpapers are prepared by the corporation's own tax accountants to document the contents of the accrual for income taxes, including the current and deferred liabilities for income taxes."). "[R]outine accountant-client communication[s]," are not "protected by the attorney-client privilege." United States v. Bisanti, 414 F.3d 168, 171 (1st Cir. 2005). Accounting functions do not become privileged merely because they are performed by an attorney. See United States v. Frederick, 182 F.3d 496, 500 (7th Cir. 1999) ("a taxpayer must not be allowed, by hiring a lawyer to do the work that an accountant, or other tax preparer, or the taxpayer himself or herself, normally would do, to obtain greater protection from government investigators than a taxpayer who did not use a lawyer as his tax preparer would be entitled to") . Respondent contends that having its attorneys place what amounts to a dollar figure (through the product of the hazard percentage and the amount at stake) to an issue constitutes legal advice. But while that function–the preparation of

the reserve account–"may require some knowledge of the law, it is primarily an accounting service" and thus not entitled to the attorney-client privilege. United States v. Davis, 636 F.2d 1028, 1043 (5th Cir. 1981).

Likewise, the tax accrual workpapers the respondent's accountants generated are not privileged under 26 U.S.C. 7525. Section 7525 only applies "to the extent the communication would be considered a privileged communication if it were between a taxpayer and an attorney." 26 U.S.C. § 7525(a)(1). The creation of the tax reserve, even to the extent that it was done by or with the help of attorneys, does not constitute legal advice that is protected by the common-law attorney-client privilege. Thus, having accountants perform the work, even given the enactment of § 7525, does not provide any privilege.[11] Accountants perform a variety of services, only some of which are "tax advice." Louis F. Lobenhofer, The New Tax Practitioner Privilege: Limited Privilege and Significant Disruption, 26 Ohio N. U. L. Rev. 243, 257 ("Certified public accountants provide a host of unprivileged services to clients, including business consulting, examination and attestation of financial statements (auditing), and business valuation, in addition to providing tax advice. The privilege would not apply to client communications regarding any service except tax advice, so no comparable presumption [of the sort that law firms would enjoy] should apply to CPA firms.").

*2. Disclosure Precludes Attorney-Client and § 7525 Privileges.*

Respondent shared the "advice" it received regarding the tax accrual workpapers with E&Y, its independent auditor, eviscerating any claim of privilege that might exist. See Cassidy

[11] To the extent that the communications with accountants are otherwise protected by § 7525(a), then the Court needs to determine whether § 7525(b), which excepts communications made in connection with the promotion of tax shelters, applies to any of those communications. Our opening brief identified the nine SILO transactions as listed transactions, the IRS having determined that such "transactions are tax avoidance transactions." Notice 2005-13, (2005-9 I.R.B.630, 2005 WL 327549). To the extent that respondent engaged in SILO or other transactions that are considered tax shelters under § 6662, those portions of the tax accrual workpapers are not privileged under § 7525.

Aff. ¶¶ 13-14 (for Textron); Raymond Aff. ¶¶ 13-14 (for Textron Financial). See Cavallaro v. United States, 284 F.3d 236, 247 (1st Cir. 2002); El Paso, 682 F.2d at 540 ("disclosure of the tax pool analysis to the auditors destroys confidentiality with respect to it," and that "[w]ith the destruction of confidentiality goes as well the right to claim the attorney-client privilege.").

The status of E&Y as the independent auditor also precludes any finding that communications with E&Y are within the Internal Revenue Code § 7525 privilege. This privilege only applies "to the extent the communication would be considered a privileged communication if it were between a taxpayer and an attorney." 26 U.S.C. § 7525(a)(1). As we discuss above (in the discussion concerning whether the Textron Financial accountants provided advice covered by § 7525), the creation of a tax reserve does not constitute legal advice that is covered by the attorney-client privilege. But the claim of a § 7525 relationship with the independent auditors fails for a further reason: respondent cannot show that it was in a privileged relationship with its independent auditors. See Doe v. Wachovia Corp., 268 F. Supp. 2d 627, 635 (W.D. N.C. 2003) ("There can be no attorney-client relationship without a fiduciary relationship.") A privileged relationship cannot exist when E&Y's loyalty and duty runs not to Textron, but to the investing public.

Recognizing that its independent auditors owe a duty to the public, respondent attempts to manufacture a privileged relationship. Respondent suggests that some of the personnel at E&Y who performed the independent audit were "Tax Partners,"–professionals who arguably might claim a privileged relationship by virtue of § 7525 – and therefore, the relationship between respondent and E&Y is within § 7525. Resp't Br. at 19-20. As explained in the above quoted statement from Arthur Young, however, the independent auditor, whether acting through persons denominated "tax partner" or "audit partner" cannot be in a privileged relationship with the company under audit. Thus, even if the communications between respondent and E&Y

otherwise would qualify as "tax advice," the nature of the audit engagement precludes extension of the privilege to communications shared in the audit. As a result, disclosures to E&Y preclude a finding that the tax accrual workpapers are privileged.

C. Respondent's Improper Purpose Argument Is Unfounded.

Respondent contends that the request for tax accrual workpapers was made not to aid the examination of its returns and determination of its correct liability, but used as a pretext to coerce behavior in the corporate boardroom.

Respondent's assertion of "pre-text" cannot stand because upon examination, each contention supporting its pre-text argument fails. First, respondent alleges that the IRS has completed its examination. This assertion is contrary to the evidence–Vasconellos's testimony that the examination is not complete have not been directly challenged by any of the respondent's affidavits. Aside from aspersions and innuendo, respondent does not challenge the factual statements in the Vasconcellos Declaration demonstrating a legitimate purpose in conducting this examination. Respondent has not offered any evidence to support its allegations, other than the undisputed facts that the IRS has throughout the audit issued many document requests and now awaits compliance with this request to inform additional requests and/or to complete the audit. Respondent does not dispute that the tax accrual workpapers may shed light on the analysis of issues the IRS has examined and may identify issues it has yet to exam.

The assertion is also contrary to law. The Supreme Court in Arthur Young having held that tax accrual workpapers are relevant to an examination, respondent cannot challenge the relevance of the tax accrual workpapers. Respondent thus attempts to convert a relevance challenge into a challenge to the IRS's legitimate purpose in seeking information unquestionably relevant to the examination and determination of respondent's tax liabilities. Respondent cannot cut off otherwise relevant information because respondent concludes the IRS has "enough." See

Tiffany Fine Arts, Inc. v. United States, 469 U.S. 310, 323 (1985) ("The decision of how many, and which, licensees to contact is one for the IRS-not Tiffany-to make."). Even where the IRS has reached tentative conclusions about the tax treatment of transactions, it may continue the examination and seek all relevant information. PAA Mgmt., Ltd. v. United States, 962 F.2d 212, 218-19 (2d Cir. 1992) (summons for relevant information enforceable even after final adjustment notices are issued).

Second, respondent does not actually challenge the IRS's compliance with its own procedures. Respondent does not challenge the fact that the SILO transactions are covered by Notice 2005-13; it merely disagrees (as it is entitled to do during an examination such as this), with the IRS's position that the tax benefits associated with such transactions are not legitimate. Nothing in this action will prevent respondent from litigating the merits of the SILO transactions, or any other transactions whose existence might be lurking in the tax accrual workpapers. Given Arthur Young and the IRS's compliance with procedures it crafted to seek tax accrual workpapers under certain circumstances, respondent's assertion that the IRS had an improper purpose in seeking its tax accrual workpapers is without merit. Respondent cites to an internal revenue manual provision (I.R.M. 4.10.20.3.2.3.4) that respondent suggests allows the IRS examination team to withdraw a request for tax accrual workpapers if a taxpayer concedes the merits of the listed transaction which initiated the request and respondent then claims this shows that the request was made to obtain such a concession. The manual provision cannot shoulder the weight respondent places on it. The manual provides:

> (4) The term "as a discretionary matter" as used in this section of the IRM denotes the exercise of prudence in executing policies. Wherever that term is used within this section of the IRM, the presumption is that the Service will request all tax accrual workpapers. There may be rare instances in which requesting all workpapers might not be appropriate. For example, if the taxpayer fully concedes all listed transactions, including penalties, and the parties have executed a specific matters closing agreement with respect to the issues conceded by the taxpayer

> then it may be appropriate not to seek all of the workpapers. If there is an exceptional situation where the examiner believes it is not appropriate to pursue all of the tax accrual workpapers, approval not to request all of the workpapers would be required. For LMSB cases, the approval of the Director, Field Operations, LMSB would be required. For SBSE cases, approval would be required by the Area Compliance Director, with the concurrence of the Director of Compliance Policy, SBSE.

When a taxpayer enters into a closing agreement pursuant to I.R.C. § 7121, no further examination of that transaction is necessary.[12] Thus, it would be entirely appropriate to withdraw the request for information, including the tax accrual workpapers, relevant to that examination. To the extent that respondent is asserting that the IRS has offered to withdraw the request in this case if this taxpayer concedes the merits of the SILO transaction, respondent is, at best, mistaken and, at worst, disingenuous.

Finally, it is a result, not a purpose, of the IRS seeking tax accrual workpapers more frequently due to its policy change, that corporate directors and officers will factor into their decisionmaking the greater probability that their aggressive tax transactions will come to light. Indeed, the policy shift was adopted because of the explosion in aggressive corporate tax shelters and the concern that such shelters were not being uncovered during examinations. As the IRS stated when it announced the policy change: "This limited expansion of the circumstances in which the Service will seek Tax Accrual Workpapers is necessary to allow the Service to fulfill its obligation to the public to curb abusive tax avoidance transactions and to ensure that taxpayers are in compliance with the tax laws." Announcement 2002-63 (Vasconcellos Decl. Ex. 2). The policy change is not an improper purpose for this examination in general or examination of respondent's tax accrual workpapers in particular, as the workpapers are clearly relevant to the IRS's examination of Textron. Rather, to the extent that corporate directors and officers factor this policy change into their decisionmaking, it is a collateral consequence of the IRS using all

[12] Statutory closing agreements are, absent fraud, "final and conclusive." I.R.C. § 7121(b).

the tools at its disposal to examine fully the tax returns of a large and complex corporate taxpayer in order to determine its correct tax liability.

D. The Government Seeks The Bulk of the Documents Labeled as Non-Responsive on the Privilege Log.

The government seeks enforcement of the summons to the extent that it relates to most of the items listed as "non-responsive" on the privilege log. The overwhelming majority of such items labeled as "non-responsive" are labeled as such either because they relate to the tax accrual reserve for foreign or state tax liabilities and/or they relate to the tax accrual reserve for years other than 2001. The summons applies to such items, and the items are responsive, as they are relevant to the exam.

The summons's definition of "Tax Accrual Workpapers" includes "all accrual and other financial workpapers or documents created or assembled by the Taxpayer, an accountant for the Taxpayer, or the Taxpayer's independent auditor related to *any tax reserve* for current, deferred, and potential contingent liabilities". (Summons, Attachment A, ¶ 4) (emphasis added.) The summons clearly seeks workpapers related to "any tax reserve," is not limited to workpapers concerning the federal tax reserve, and therefore includes a reserve for state or foreign tax liabilities. Because a taxpayer typically is able to claim a deduction on its federal income tax return for taxes paid to other jurisdictions, the tax accrual workpapers related to the state or foreign tax liabilities are relevant to the determination of respondent's federal income tax liability. Supplemental Carmichael Decl. ¶ 7. In addition to the issues identified in the foreign or state tax reserves directly affecting federal tax liability, the tax accrual workpapers for foreign and state tax reserves may identify issues not identified in federal tax accrual workpapers which the IRS may find relevant to the examination of the Respondent.

Likewise, the summons seeks the production of any tax accrual workpapers "created or

assembled" by Respondent for the 2001 tax year. The summons thus seeks not only the new documents "created" by Respondent, but also the documents Respondent obtained from other years that are contained in its 2001 tax accrual workpaper file. If Respondent assembled such documents when it compiled its 2001 tax accrual workpapers, then such items are responsive to the summons, and the government is entitled to have the summons enforced with respect to such items.

Finally, the summons seeks documents created or assembled by Respondent's independent auditor, E&Y. The privilege log identifies only one document, SUM00498, as a document prepared by E&Y. That document is described as an e-mail request for information. The government seeks enforcement of the summons with respect to SUM00498 and to all other tax accrual workpapers prepared by E&Y, even if not identified on the log.

## Conclusion

For the reasons set forth here, and in the Petition to Enforce, supporting affidavits and memorandum of law, the Court should order enforcement of the summons

ROBERT CLARK CORRENTE
United States Attorney

/s/ Thomas P. Cole
THOMAS P. COLE
JENNIFER AUCHTERLONIE
Trial Attorneys, Tax Division

CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing **UNITED STATES' REPLY TO RESPONDENT'S OPPOSITION TO PETITION TO ENFORCE SUMMONS** has been made by filing it with the Court via the ECF system, this 14th day of September, 2006. There are no parties that need to be served by manual means.

/s/ Thomas P. Cole
THOMAS P. COLE
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 514-9611