**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

UNITED STATES OF AMERICA

Petitioner,

v. C.A. No. 06-198T

TEXTRON INC. AND SUBSIDIARIES,

Respondent.

**MEMORANDUM AND ORDER**

Pursuant to 26 U.S.C. §§ 7402(b) and 7604, the United States has filed a petition to enforce an Internal Revenue Service (IRS) summons served on Textron Inc. and its subsidiaries ("Textron") in connection with the IRS's examination of Textron's tax liability for tax years 1998-2001. The summons seeks Textron's "tax accrual workpapers" for its 2001 tax year. Textron has refused to produce the requested documents on the grounds that (1) the summons was not issued for a legitimate purpose and (2) the tax accrual workpapers are privileged.

Because this Court finds that the requested documents are protected by the work product privilege, the petition for enforcement is denied.

**Facts**

Based on the pleadings, affidavits submitted by the parties, and the evidence presented at a hearing conducted on June 26, 2007, this Court finds the relevant facts to be as follows.

Textron, Inc. is a publicly traded conglomerate with

approximately 190 subsidiaries. One of its subsidiaries is Textron Financial Corporation (TFC), a company that provides commercial lending and financial services. In 2001 and 2002, Textron had six tax attorneys and a number of CPAs in its tax department but TFC's tax department consisted only of CPAs. Consequently, TFC relied on attorneys in Textron's tax department, private law firms, and outside accounting firms for additional assistance and advice regarding tax matters.

Like other large corporations, Textron's federal tax returns are audited periodically at which time the IRS examines the returns for the tax years that are part of the audit cycle. In conducting its audits, the IRS, typically, gathers relevant information by issuing "information document requests" (IDRs) to the taxpayer. If the IRS disagrees with a position taken by the taxpayer on its return, the IRS issues a Notice of Proposed Adjustments to the taxpayer. A taxpayer that disputes the proposed adjustments has several options to resolve the dispute within the agency. Those options range from an informal conference with the IRS team manager to a formal appeal to the IRS Appeals Board. If the dispute is not resolved within the agency, the taxpayer may file suit in federal court. In seven of its past eight audit cycles covering the period between 1980 and the present, Textron appealed disputed matters to the IRS Appeals Board; and three of these disputes resulted in

litigation.[1]

During the 1998-2001 audit cycle, the IRS learned, from examining Textron's 2001 return, that TFC had engaged in nine "sale-in, lease-out" (SILO) transactions involving telecommunications equipment and rail equipment. The IRS has classified such transactions as "listed transactions" because it considers them to be of a type engaged in for the purpose of tax avoidance. See 26 C.F.R. § 1.6011-4(b)(2). The IRS issued more than 500 IDRs in connection with the 1998-2001 audit cycle, and Textron complied with all of them, except for the ones seeking its "tax accrual workpapers."

The Summons

On June 2, 2005, Revenue Agent Vasconcellos, the manager of the IRS team examining Textron's return, issued an administrative summons for "all of the Tax Accrual Workpapers" for Textron's tax year ending on December 29, 2001. The summons defined the "Tax Accrual Workpapers" to include:

> [A]ll accrual and other financial workpapers or documents created or assembled by the Taxpayer, an accountant for the Taxpayer, or the Taxpayer's independent auditor relating to any tax reserve for current, deferred, and potential or contingent tax liabilities, however classified or reported on audited financial statements,

---

[1]See Textron, Inc. v. Comm'r, 117 T.C. 67 (2001) (relating to federal income tax liability for tax years 1987 through 1992); Textron, Inc. v. Comm'r, 336 F.3d 26 (1st Cir. 2003) (appeal regarding a different issue raised in the tax court); Textron, Inc. v. United States, 418 F. Supp. 39 (D.R.I. 1976) (relating to tax years 1959 through 1962).

> and to any footnotes disclosing reserves or contingent liabilities on audited financial statements. They include, but are not limited to, any and all analyses, computations, opinions, notes, summaries, discussions, and other documents relating to such reserves and any footnotes. . . .

Textron refused to produce its tax accrual workpapers, asserting that they are privileged and that the summons was issued for an improper purpose.

<u>The Tax Accrual Workpapers</u>

Because there is no immutable definition of the term "tax accrual workpapers," the documents that make up a corporation's "tax accrual workpapers" may vary from case to case.[2] In this case, the evidence shows that Textron's "tax accrual workpapers" for the years in question consist, entirely, of:

1. A spreadsheet that contains:

   (a) lists of items on Textron's tax returns, which, in the opinion of Textron's counsel, involve issues on which the tax laws are unclear, and, therefore, may be challenged by the IRS;

   (b) estimates by Textron's counsel expressing, in percentage terms, their judgments regarding Textron's chances of prevailing in any litigation

---

[2]Professor Douglas Carmichael, the government's expert, explained that the content of tax accrual workpaper files "does vary" because "Companies organize their records in different ways." Transcript of June 26, 2007 Evidentiary Hearing at 132. <u>See also</u> <u>United States v. El Paso Co.</u>, 682 F.2d 530, 533 (5th Cir. 1982) (noting the many names for tax accrual workpapers).

over those issues (the "hazards of litigation percentages"); and

(c) the dollar amounts reserved to reflect the possibility that Textron might not prevail in such litigation (the "tax reserve amounts").

2. Backup workpapers consisting of the previous year's spreadsheet and earlier drafts of the spreadsheet together with notes and memoranda written by Textron's in-house tax attorneys reflecting their opinions as to which items should be included on the spreadsheet and the hazard of litigation percentage that should apply to each item.

The evidence shows that while Textron may possess documents, such as leases, that contain factual information regarding the SILO transactions and other items that may be listed on the spreadsheet, its tax accrual workpaper files do not include any such documents.

As stated by Norman Richter, Vice President of Taxes at Textron and Roxanne Cassidy, Director, Tax Reporting at Textron, Textron's ultimate purpose in preparing the tax accrual workpapers was to ensure that Textron was "adequately reserved with respect to any potential disputes or litigation that would happen in the future." It seems reasonable to infer that Textron's desire to establish adequate reserves also was prompted, in part, by its wish to satisfy an independent auditor that Textron's reserve for

contingent liabilities satisfied the requirements of generally accepted accounting principles (GAAP) so that a "clean" opinion would be given with respect to the financial statements filed by Textron with the SEC.

Each year, Textron's tax accrual workpapers are prepared shortly after the corporation's tax return is filed. The first step in preparing the workpapers is that Textron's accountants circulate to Textron's attorneys a copy of the previous year's tax accrual workpapers together with recommendations regarding their proposed changes and/or additions for the current year. Textron's attorneys, then, review those materials, propose further changes to the spreadsheets and hazard litigation percentages which are returned to the accountants who compile the information and perform the mathematical calculations necessary to compute the tax reserve amounts. The attorneys and accountants, then, meet to give their approval so that the accountants may finalize the workpapers.

TFC goes through a similar process in preparing its tax accrual workpapers but, since TFC does not have any in-house attorneys, its accountants rely on tax advice obtained from outside accounting and law firms, before meeting with a Textron tax attorney to finalize the workpapers.

Once the tax reserve amounts for each item on the worksheets are established, those amounts are aggregated with other contingent liabilities and the total is reported as "other liabilities" on

Textron's financial statements.

During the course of an audit conducted by Ernst & Young (E&Y), Textron's independent auditor, Textron permitted E&Y to examine the final tax accrual workpapers at issue in this case with the understanding that the information was to be treated as confidential.

## **Analysis**

I. The Summons

A. Scope and Enforceability, in General

Section 7602 authorizes the IRS to issue administrative summonses for the production of "any books, papers, records, or other data which may be relevant or material" in "ascertaining the correctness of any return, . . ., determining the liability of any person for any internal revenue tax . . . , or collecting any such liability. . . ." 26 U.S.C. § 7602(a). The Supreme Court has described § 7602 as a "broad summons authority" reflecting a "congressional policy choice *in favor of disclosure* of all information relevant to a legitimate IRS inquiry." United States v. Arthur Young & Co., 465 U.S. 805, 816, 104 S. Ct. 1495, 1502, 79 L. Ed. 2d 826 (1984).

When documents requested in a summons are not produced, the United States may petition a federal district court for an order compelling compliance. 26 U.S.C. § 7604. To obtain such an order, the IRS must show: (1) that there is a legitimate purpose for the

investigation pursuant to which the summons is being sought, (2) that the inquiry or the materials sought may be relevant to that purpose, (3) that the information sought is not already within the Commissioner's possession, and (4) that the administrative steps required by the Code have been followed. United States v. Powell, 379 U.S. 48, 57-58, 85 S. Ct. 248, 255, 13 L. Ed. 2d 112 (1964).

The government may make a prima facie showing that those requirements have been satisfied "on the face of the summons and by supporting affidavits." United States v. Freedom Church, 613 F.2d 316, 321 (1st Cir. 1979). See also United States v. Lawn Builders of New England, Inc., 856 F.2d 388, 392 (1st Cir. 1988) ("Assertions by affidavit of the investigating agent that the requirements are satisfied are sufficient to make the prima facie case.") (quoting Liberty Financial Servs. v. United States, 778 F.2d 1390, 1392 (9th Cir. 1985)). When the requisite showing has been made, the burden shifts to the party summoned to present evidence that the Powell requirements have not been satisfied or that there is some other reason why the summons should not be enforced. Freedom Church, 613 F.2d at 319 (citing, inter alia, United States v. LaSalle Nat. Bank, 437 U.S. 298, 316, 98 S. Ct. 2357, 57 L. Ed. 2d 221 (1978)).

In this case, Textron does not dispute that the documents

sought may be relevant[3] or that the IRS has followed the necessary administrative steps in issuing the summons. Rather, Textron argues that the IRS seeks the documents for the purpose of using them as leverage in settlement negotiations and that the documents are privileged.

B. The Legitimate Purpose Requirement

Whether the purpose for issuing a summons is legitimate depends on the circumstances. Section 7602(a) makes it clear that "ascertaining the correctness of any return" and "determining the liability of any person for any internal revenue tax" are legitimate purposes for issuing a summons. On the other hand, it is improper to "us[e] a civil summons to gather evidence to be used solely in a criminal prosecution," United States v. Kis, 658 F.2d 526, 535 (7th Cir. 1981), or to issue a summons "to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." Powell, 379 U.S. at 58.

In this case, the statements on the face of the summons, itself, and the supporting declaration of Agent Vasconcellos that

---

[3]In United States v. Arthur Young & Co., 465 U.S. 805, 104 S. Ct. 1495, 79 L. Ed. 2d 826 (1984), the Supreme Court held that an IRS summons satisfies the relevance prong of the Powell test if the documents sought "'might have thrown light upon' the correctness of [the taxpayer's] return," Arthur Young, 465 U.S. at 813-14, and that the "tax accrual workpapers" involved in that case, which were prepared by the taxpayer's outside auditor, satisfied that relevance standard. 465 U.S. at 815.

the purpose of the summons is to "ascertain the correctness of the tax returns filed by the taxpayer" for the years in question, constitute a prima facie showing that the purpose is legitimate. Consequently, the burden is on Textron to "create a 'substantial question in the court's mind regarding the validity of the government's purpose.'" United States v. Gertner, 65 F.3d 963, 967 (1st Cir. 1995) (quoting United States v. Salter, 432 F.2d 697, 700 (1st Cir. 1970)). In order to carry its burden, Textron "must articulate specific allegations of bad faith and, if necessary, produce reasonably particularized evidence in support of those allegations." Id.

In arguing that the government's stated purpose is pretextual and that the IRS's real objective is to use the opinions of Textron's counsel and tax advisers with respect to the SILO transactions as a bargaining lever, Textron alleges that the 2001 examination was substantially completed when the summons was issued; that Textron already had provided numerous documents requested by the IRS regarding the SILO transactions; and that the IRS could have requested any additional documents regarding the facts underlying those transactions. However, those allegations are insufficient to establish a bad faith purpose.

As a factual matter, the IRS disputes the assertion that the 2001 examination had been substantially completed when the summons was issued and the only evidence offered by Textron on this point

was an IRS agenda for a March 22, 2005 meeting between the parties which stated, simply, that the purpose of the meeting was to determine what steps were needed to bring the examination to completion. Nor does Textron's production of other documents relating to the SILO transactions or the fact that the IRS could have requested additional documents by issuing IDRs raise a substantial question as to bad faith. The IRS has discretion to determine the manner in which its investigation should be conducted. See United States v. Norwest Corp., 116 F.3d 1227, 1233 (8th Cir. 1997) ("[I]t is for the agency, and not the taxpayer, to determine the course and conduct of an audit"). Accordingly, the IRS is not required to obtain relevant documents by the least formal means possible. See Tiffany Fine Arts, Inc. v. United States, 469 U.S. 310, 323, 105 S. Ct. 725, 732, 83 L. Ed. 2d 678 (1985) (the IRS is not required to "conduct its investigations in the least intrusive way possible.").

Textron also argues that the summons is overbroad because it seeks not only TFC's tax accrual workpapers but, also, the tax accrual workpapers for Textron and all of its subsidiaries. However, the request for Textron's workpapers does not establish bad faith because TFC is a subsidiary of Textron and the IRS asserts that it is seeking to determine Textron's overall tax liability, not just any tax due from the SILO transactions.

In short, the IRS has made a prima facie showing that the

Powell requirements have been satisfied and Textron has failed to rebut that showing.

II. Applicability of Privilege

Satisfaction of the Powell requirements is not sufficient to warrant enforcement of an IRS summons if the documents sought are privileged. Upjohn Co. v. United States, 449 U.S. 383, 386, 101 S. Ct. 677, 681, 66 L. Ed. 2d 584 (1981) (refusing to enforce IRS summons because documents sought contained communications protected by the attorney-client privilege and also recognizing that "the work-product doctrine does apply in tax summons enforcement proceedings."). In general, when a claim of privilege is made, the party asserting the privilege "has the burden of establishing not only the existence of that privilege, but also that the privilege was not waived." In re Raytheon Sec. Litig., 218 F.R.D. 354, 357 (D. Mass. 2003).

In this case, Textron argues that its tax accrual workpapers are protected by the attorney-client privilege, the tax practitioner-client privilege created by 26 U.S.C. § 7525, and the work product privilege.

A. Attorney-Client Privilege

The attorney-client privilege protects confidential communications between an attorney and client relating to legal advice sought from the attorney. See United States v. Bisanti, 414 F.3d 168, 171 (1st Cir. 2005); Cavallaro v. United States, 284 F.3d

236, 245 (1st Cir. 2002). Since the privilege may hamper the search for truth by preventing the disclosure of relevant evidence, it is narrowly construed. In re Keeper of Records (XYZ Corp.), 348 F.3d 16, 22 (1st Cir. 2003) ("the attorney-client privilege must be narrowly construed because it comes with substantial costs and stands as an obstacle of sorts to the search for truth."). Narrow construction of the privilege is especially called for in the case of tax investigations because of "the 'congressional policy choice *in favor of disclosure* of all information relevant to a legitimate IRS inquiry.'" Cavallaro, 284 F.3d at 245 (quoting Arthur Young, 465 U.S. at 816).

Textron's affidavits state that its tax accrual workpapers are privileged because they were prepared by counsel and reflect counsel's legal conclusions in identifying items on Textron's return that may be challenged and assessing Textron's prospects of prevailing in any ensuing litigation. (Richter Aff. ¶¶ 13, 22.) The IRS argues that the workpapers are not privileged because, in preparing them, Textron's attorneys were not providing legal advice but, rather, were performing an accounting function by reconciling the company's tax records and financial statements.

It is true that, generally, the mere preparation of a tax return is viewed as accounting work and a taxpayer may not cloak the documents generated in that process with a privilege simply "by hiring a lawyer to do the work that an accountant, or other tax

preparer, or the taxpayer himself . . . normally would do." United States v. Frederick, 182 F.3d 496, 500 (7th Cir. 1999). See E.S. Epstein, The Attorney-Client Privilege and the Work-Product Doctrine 246 (4th ed. 2001). On the other hand, it is equally true that communications containing legal advice provided by an attorney may be privileged even though they are made in connection with the preparation of a return.

> Determining the tax consequences of a particular transaction is rooted entirely in the law. . . . [Therefore] [c]ommunications offering tax advice or discussing tax planning . . . are 'legal' communications.

U.S. v. Chevron Texaco Corp., 241 F. Supp. 2d 1065, 1076 (N.D. Cal. 2002). See Epstein, at 249; Louis F. Lobenhoffer, The New Tax Practitioner Privilege: Limited Privilege and Significant Disruption, 26 Ohio N.U. L. Rev. 243, 252 (2000) (the attorney-client privilege should not be lost when true legal advice or lawyer's work is performed, albeit in support of an accounting or financial reporting function).

The Seventh Circuit explained the distinction, in the context of an IRS audit, by stating that where representation during an audit consists of "merely verifying the accuracy of a return," it is "accountants' work"; but, if the attorney participates in the audit "to deal with issues of statutory interpretation or case law" that may have been raised in connection with examination of the taxpayer's return, "the lawyer is doing lawyer's work and the attorney-client privilege may attach." Frederick, 182 F.3d at 502.

Furthermore, in United States v. El Paso Co., the Fifth Circuit addressed the distinction as it applies specifically to tax accrual workpapers by observing that, while preparation of tax accrual work papers might be considered an accounting function, "we would be reluctant to hold that a lawyer's analysis of the soft spots in a tax return and his judgment on the outcome of the litigation on it are not legal advice." United States v. El Paso Co., 682 F.2d 530, 539 (5th Cir. 1982).

Here, since the tax accrual workpapers of Textron and TFC essentially consist of nothing more than counsel's opinions regarding items that might be challenged because they involve areas in which the law is uncertain and counsel's assessment regarding Textron's chances of prevailing in any ensuing litigation, they are protected by the attorney-client privilege.

The IRS's reliance on Arthur Young is misplaced because, although Arthur Young deemed tax accrual workpapers pinpointing the "soft spots" on a corporation's tax return relevant to examination of the corporation's return, it did not hold the attorney-client privilege inapplicable to legal conclusions of counsel contained in the workpapers. On the contrary, Arthur Young expressly recognized that "§ 7602 is 'subject to the traditional privileges and limitations.'" Arthur Young, 465 U.S. at 816 (citation omitted). Arthur Young also is distinguishable on the ground that, there, the workpapers had been prepared by the corporation's independent

auditor whose "obligation to serve the public interest assures that the integrity of the securities markets will be preserved." Arthur Young, 465 U.S. at 819. By contrast, Textron's workpapers were prepared by its counsel whose function was to provide legal advice to Textron.

B. Tax Practitioner-Client Privilege - § 7525

Section 7525, which created a tax practitioner privilege, was enacted after the Supreme Court's decision in Arthur Young, which declined to create a new "accountant-client privilege" between a corporation and its independent auditor. Arthur Young, 465 U.S. at 817. Section 7525 confers a privilege on tax advice in the form of confidential communications "between a taxpayer and any federally authorized tax practitioner" to the same extent that such communications would be protected between a taxpayer and an attorney. 26 U.S.C. § 7525(a)(1).

In the case of a corporation, the privilege does not apply to written communications between the tax practitioner and the corporation "in connection with the promotion of the direct or indirect participation of such corporation in any tax shelter (as defined in section 6662(d)(2)(C)(iii))." 26 U.S.C. § 7525(b) (2001). Nor does the privilege extend to a tax practitioner's "work product" in preparing a return or to "communications between a tax practitioner and a client simply for the preparation of a tax return." United States v. KPMG, LLP, 316 F. Supp. 2d 30, 35

(D.D.C. 2004) ("nothing in the statute 'suggests that these nonlawyer practitioners are entitled to privilege when they are doing other than lawyers' work'") (emphasis in original) (citation omitted).

Textron argues that, to the extent that the workpapers in question reflect the advice that TFC received from CPAs in its tax department, they are privileged under § 7525. The IRS argues that the opinions of TFC's tax accountants do not qualify for protection under § 7525(a); and, even if they did, they fall within the exception contained in § 7525(b).

Since TFC's tax accountants participated in advising Textron regarding its tax liability with respect to matters on which the law is uncertain and/or estimating the hazards of litigation percentages, they were performing "lawyers' work." Accordingly, that advice would qualify for the privilege conferred by § 7525(a). See 26 U.S.C. 7525(a) (tax advice communications protected "to the extent the communication would be considered a privileged communication if it were between a taxpayer and an attorney.").

In support of its argument that the written communications from TFC's tax accountants fall within the "promotion" of a tax shelter exception created by § 7525(b), the IRS points out that 26 U.S.C. § 6662(d)(2)(C)(ii) defines "tax shelter" to include any arrangement "a significant purpose" of which "is the avoidance or evasion of Federal income tax" and that an IRS notice identifies

SILO transactions as a type of tax avoidance arrangement. See 26 C.F.R. § 1.6011-4(b)(2); IRS Notice 2005-13 (February 11, 2005), 2005-9 I.R.B. 630. That argument is not persuasive because even if the SILO transactions in which TFC engaged are characterized as "tax avoidance" transactions the communications were not made "in connection with the promotion" of TFC's participation in them. 26 U.S.C. § 7525(b) (emphasis added).

Section 7525(b) is aimed at communications by outside tax practitioners attempting to sell tax shelters to a corporate client. See 144 Cong. Rec. S7643-02, S7667 (July 8, 1998) (statement of Sen. Mack) ("[section 7525(b)] was meant to target written promotional and solicitation materials used by the peddlers of corporate tax shelters"). As the Conference Report relating to § 7525(b) stated "[t]he Conferees do not understand the promotion of tax shelters to be part of the routine relationship between a tax practitioner and a client. Accordingly, the Conferees do not anticipate that the tax shelter limitation will adversely affect such routine relationships." H.R. Rep. No. 105-599 (Conf. Report to Accompany HR 2676) (June 24, 1998).

Here, TFC's accountants were not "peddlers of corporate tax shelters" or outside promoters soliciting TFC's participation in the SILO transactions. Rather, they were acting as tax advisers and the workpapers reflect their opinions regarding the foreseeable tax consequences of transactions that, already, had taken place,

not future transactions they were seeking to promote.

C. The Work Product Privilege

1. The Nature of the Privilege

The work product privilege applies to materials prepared or gathered by an attorney in anticipation of litigation or preparation for trial. The purpose of the privilege is "to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation' free from unnecessary intrusion by his adversaries," United States v. Adlman, 134 F.3d 1194, 1196 (2d Cir. 1998) (citing Hickman v. Taylor, 329 U.S. 495, 510-11, 67 S. Ct. 685, 393-94, 91 L. Ed. 451 (1947)), "to prevent a litigant from taking a free ride on the research and thinking of his opponent's lawyer and to avoid the resulting deterrent to a lawyer's committing his thoughts to paper." Frederick, 182 F.3d at 500.

The privilege first was articulated by the Supreme Court in Hickman v. Taylor, 329 U.S. 495, 67 S. Ct. 685, 91 L. Ed. 451 (1947), and, later, was codified in Federal Rule of Civil Procedure 26(b)(3) which provides:

> (3) Trial Preparation Materials. . . . a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative . . . only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.

> In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

Fed. R. Civ. P. 26(b)(3)(emphasis added).

As the rule indicates, unlike the attorney-client privilege, the work product privilege is a qualified privilege which may be overcome by a showing of "substantial need." Fed. R. Civ. P. 26(b)(3). The burden of establishing "substantial need" rests on the party seeking to overcome the privilege; and, when "opinion work product" consisting of "mental impressions, conclusions, opinions or legal theories" of attorneys is involved, the burden of establishing "substantial need" is greater than it is with respect to documents that are merely obtained by a party. Upjohn, 449 U.S. at 401-2 ("we think a far stronger showing of necessity and unavailability by other means . . . would be necessary to compel disclosure" of opinion work-product.). Indeed, some courts have accorded "nearly absolute" protection to work product consisting of opinions or theories. In re Grand Jury Subpoena, 220 F.R.D. 130, 145 (D. Mass. 2004) (collecting cases).

In Upjohn, the Supreme Court made it clear that the work product privilege may be invoked in response to IRS summonses.

> [T]he obligation imposed by a tax summons remains 'subject to the traditional privileges and limitations.' . . . Nothing in the language of the IRS summons provisions or their legislative history suggests an intent on the part of Congress to preclude application of the work-product doctrine. Rule 26(b)(3) codifies the

> work-product doctrine, and the Federal Rules of Civil Procedure are made applicable to summons enforcement proceedings by Rule 81(a)(3).

Upjohn, 449 U.S. at 398-99 (citation omitted).

2. The "In Anticipation of Litigation" Requirement

Courts have applied two different tests in determining whether a document was prepared "in anticipation of litigation." Under the "primary purpose" test, documents are held to be prepared in anticipation of litigation "as long as the primary motivating purpose behind the creation of a document was to aid in possible future litigation." El Paso, 682 F.2d at 542. Under the more inclusive "because of" test, the relevant inquiry is whether the document was prepared or obtained "because of" the prospect of litigation. United States v. Adlman, 134 F.3d 1194 (2d Cir. 1998). In Adlman, after making a detailed analysis of the two tests, the Second Circuit found the "because of" test "more consistent with both the literal terms and the purposes of [Rule 26(b)(3)]" and the Court stated:

> In short, the enforceability of the IRS summons for the Memorandum will turn on whether it (or substantially the same document) would have been prepared irrespective of the anticipated litigation and therefore was not prepared because of it.

Adlman, 134 F.3d at 1198, 1205.

The First Circuit has adopted the "because of" test articulated in Adlman. Maine v. Dept. of the Interior, 298 F.3d 60, 68 (1st Cir. 2002).

Textron asserts that its tax accrual workpapers were prepared because it anticipated the possibility of litigation with the IRS regarding various items on its return and it points to the hazards of litigation percentages as evidence that the possibility of such litigation was the reason for preparing the workpapers. The IRS asserts that the workpapers were prepared in the ordinary course of business and in order to satisfy the requirements of the securities laws that financial statements filed by publicly traded companies comply with GAAP (which mandate the creation of reserves to meet contingent liabilities). The IRS contends that Textron had to provide its independent auditor with the kind of information contained in the workpapers in order to obtain a "clean" opinion that the reserves satisfy GAAP's requirements.

As the IRS correctly observes, the work product privilege does not apply to "'documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation.'" Maine, 298 F.3d at 70 (quoting Adlman, 134 F.3d at 1202). However, it is clear that the opinions of Textron's counsel and accountants regarding items that might be challenged by the IRS, their estimated hazards of litigation percentages and their calculation of tax reserve amounts would not have been prepared at all "but for" the fact that Textron anticipated the possibility of litigation with the IRS. If Textron had not anticipated a dispute with the IRS, there would have been

no reason for it to establish any reserve or to prepare the workpapers used to calculate the reserve. Thus, while it may be accurate to say that the workpapers helped Textron determine what amount should be reserved to cover any potential tax liabilities and that the workpapers were useful in obtaining a "clean" opinion from E&Y regarding the adequacy of the reserve amount, there would have been no need to create a reserve in the first place, if Textron had not anticipated a dispute with the IRS that was likely to result in litigation or some other adversarial proceeding.

Nor can there be any doubt that Textron's belief in the likelihood of litigation with the IRS was well-founded. As already noted, the matters identified in the workpapers dealt with issues on which the law was unclear. Moreover, in seven of Textron's eight previous audit cycles, "unagreed" issues had been appealed to the IRS Appeals Board, and three of those issues were litigated in federal court.

The IRS relies on El Paso for the proposition that tax accrual workpapers are prepared in the ordinary course of business; and, therefore, are not protected by the work product privilege. However, El Paso is not persuasive because it applied the "primary purpose" test for determining whether documents are prepared "in anticipation of litigation" and not the "because of" test adopted by the First Circuit.

Moreover, even if the workpapers were needed to satisfy E&Y

that Textron's reserves complied with GAAP, that would not alter the fact that the workpapers were prepared "because of" anticipated litigation with the IRS. See Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc., 237 F.R.D. 176 (N.D. Ill. 2006). In Jaffe Pension Plan, letters obtained by a corporation's shareholders containing an assessment by the corporation's attorney of pending litigation against the corporation were held to be protected by the work product privilege even though the securities laws required that the letters be provided to the corporation's independent auditor. As the Jaffe Pension Plan court stated:

> Plaintiffs insist that "[t]he documents at issue here were created 'pursuant to public requirements unrelated to litigation,' and in fact, would have been created regardless of the litigation." . . . The court disagrees. In the absence of any pending or threatened litigation, Household's counsel would have had no need to advise [the independent auditor] regarding such non-existent matters. Thus, the Opinion Letters were prepared "because of" pending or threatened litigation and are protected by the work product doctrine.

Jaffe Pension Plan, 237 F.R.D. at 181. See Simon v. G. D. Searle & Co., 816 F.2d 397, 401 (8th Cir. 1987) (holding that individual case litigation reserves prepared by company's attorney were protected opinion work product).

III. Waiver or Loss of Privilege

A. The Attorney-Client and Tax Practitioner-Client Privileges

It is well established that "voluntary disclosure to a third party waives the attorney-client privilege even if the third party

agrees not to disclose the communications to anyone else." Westinghouse Elec. Corp. v. Republic of the Philippines, 951 F.2d 1414, 1427 (3d Cir. 1991). That principle has been applied specifically to disclosures made to independent auditors. First Fed. Sav. Bank of Hegewisch v. United States, 55 Fed. Cl. 263, 268-69 (Fed. Cl. 2003) (attorney-client privilege was waived when board minutes containing confidential communications between board members and outside counsel were disclosed to outside auditors who were auditing company's financial statements); Gutter v. E.I. Dupont de Nemours & Co., 1998 WL 2017926 *5 (S.D. Fla 1998) (attorney-client privilege for legal opinion letters and litigation reports to the board of directors was waived when disclosed to independent auditor); In re Pfizer Inc. Sec. Litig., 1993 WL 561125 *7 (S.D.N.Y. 1993) ("Pfizer cannot assert attorney-client privilege for any documents that were provided to its independent auditor. Disclosure of documents to an outside accountant destroys the confidentiality seal required of communications protected by the attorney-client privilege"); see also Cavallaro, 284 F.3d at 247 - 49 (attorney-client privilege was waived when communications were disclosed to outside accountants who were not retained to facilitate legal advice by attorneys).

Since the tax practitioner privilege created by § 7525 mirrors the attorney-client privilege, it, too, may be waived by disclosure to a third party. See United States v. BDO Seidman, 337 F.3d 802,

810 (7th Cir. 2003) ("the § 7525 privilege is no broader than that of the attorney-client privilege"); Doe v. KPMG, LLP, 325 F. Supp. 2d 746, 752 (N.D. Tex. 2004) (Court must "look to the law of attorney-client privilege to inform its interpretation of the taxpayer-federally authorized tax practitioner privilege.").

Textron argues that providing the tax accrual workpapers to E&Y did not waive the protection of either privilege and it seeks to distinguish the cases holding that disclosure to an outside auditor waives the attorney-client privilege on the ground that those cases were decided prior to the enactment of § 7525. More specifically, Textron argues that, because it occasionally revises its reserves based on the opinions of the independent auditor, the auditor's review of Textron's workpapers should be viewed as performed in connection with providing "tax advice" to Textron and, therefore, it is privileged under § 7525. That argument is creative but not persuasive because it ignores reality to describe an independent auditor responsible for reporting to the investing public whether a company's financial statements fairly and accurately reflect its financial condition, as providing "tax advice" to the company when the auditor seeks to determine the adequacy of amounts reserved by the company for contingent tax liabilities.

In short, any attorney-client privilege or tax practitioner privilege that attached under § 7525 was waived when Textron

provided its workpapers to E&Y.

B. The Work Product Privilege

1. Waiver

Since the work product privilege serves a purpose different from the attorney-client or tax practitioner privileges, the kind of conduct that waives the privilege also differs.

The purpose of the attorney-client and tax practitioner privileges is to encourage the full and frank discussion necessary for providing the client with sound advice. That purpose is achieved by guaranteeing that confidential communications between the client and the advisor will remain confidential. Since disclosure to a third party is inconsistent with a claim of confidentiality, such disclosure waives the privilege.

By contrast, the purpose of the work product privilege is to prevent a potential adversary from gaining an unfair advantage over a party by obtaining documents prepared by the party or its counsel in anticipation of litigation which may reveal the party's strategy or the party's own assessment of the strengths and weaknesses of its case. Accordingly, only disclosures that are inconsistent with keeping the information from an adversary constitute a waiver of the work product privilege. Gutter, 1988 WL 2017926 *3 (S.D. Fl. 1998) ("While disclosure to outside auditors may waive the attorney-client privilege, it does not waive the work product privilege"). As the First Circuit stated in United States v.

Massachusetts Institute of Technology, ("MIT"), 129 F.3d 681 (1st Cir. 1997):

> The [attorney-client] privilege . . . is designed to protect confidentiality, so that any disclosure outside the magic circle is inconsistent with the privilege; by contrast, work product protection is provided against "adversaries," so only disclosing material in a way inconsistent with keeping it from an adversary waives work product protection.

129 F.3d at 687 (collecting cases). See Jaffe Pension Plan, 237 F.R.D. at 183 ("[T]he work product privilege may be waived by disclosures to third parties 'in a manner which substantially increases the opportunity for potential adversaries to obtain the information.'") (citation omitted); In re Raytheon Sec. Litig., 218 F.R.D. at 360 (D. Mass. 2003) ("[D]isclosure of a document to third persons does not waive the protection unless it has substantially increased the opportunity for potential adversaries to obtain the information.").

Most courts considering the question have held that disclosure of information to an independent auditor does not waive the work product privilege because it does not substantially increase the opportunity for potential adversaries to obtain the information. In re JDS Uniphase Corp. Sec. Litig., 2006 WL 2850049 (N. D. Cal. 2006) (work product protection not waived when protected board minutes were disclosed to the independent auditor); Jaffe Pension Plan, 237 F.R.D. at 183 (Because an independent auditor does not have an adversarial relationship with the client, "[d]isclosing

documents to an auditor does not substantially increase the opportunity for potential adversaries to obtain the information."); Frank Betz Assocs., Inc. v. Jim Walter Homes Inc., 226 F.R.D. 533, 535 (D.S.C. 2005) (disclosure to independent auditor of documents supporting reserve for copyright infringement litigation did not waive work product protection); Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc., 229 F.R.D. 441 (S.D.N.Y. 2004) (even though an auditor "must maintain an independent role," disclosure to auditor not a waiver of work product privilege because no likelihood that the independent auditors were a conduit to an adversary . . . or that accounting rules would "mandate public disclosure" of the documents); Gutter, 1998 WL 2017926 *5, *3 (S.D. Fl. 1998) (work product privilege not waived by disclosure to auditor of letters estimating cost of litigation "since the accountants are not considered a conduit to a potential adversary" and "there is an expectation that confidentiality of such information will be maintained by the recipient."); In re Pfizer Inc. Sec. Litig., 1993 WL 561125 *6 (S.D.N.Y. 2003) (no waiver of work product privilege because auditor "not reasonably viewed as a conduit to a potential adversary.").

In this case, too, the disclosure of Textron's tax accrual workpapers to E&Y did not substantially increase the IRS's opportunity to obtain the information contained in them. Under AICPA Code of Professional Conduct Section 301 *Confidential Client*

*Information*, E&Y had a professional obligation "not [to] disclos[e] any confidential client information without the specific consent of the client." Furthermore, E&Y expressly agreed not to provide the information to any other party, and confirms that it has adhered to its promise. (Weston Af. ¶ 3; Raymond Aff. ¶ 20.) Even if the AICPA Code coupled with E&Y's promise did not establish an absolute guarantee of confidentiality, they made it very unlikely that E&Y would provide Textron's "tax accrual workpapers" to the IRS and they negate any inference that Textron waived the work product privilege.[4]

The IRS cites MIT for the proposition that disclosure to an independent auditor waives work product protection but that reliance is misplaced because MIT is factually distinguishable from this case. The documents at issue in MIT were minutes of meetings of the MIT Corporation and some of its committees relating to bills submitted by MIT for services rendered pursuant to a contract with the Department of Defense (DOD). The documents were requested by the Defense Contract Audit Agency (DCAA) in order to confirm that the bills were justified and MIT provided the minutes due, in part, to the fact that DCAA "regulations and practices offered MIT some

[4]The IRS points out that Rule 301 provides that it shall not be construed to relieve an auditor of its obligation to adhere to applicable accounting standards set forth by GAAP or auditing standards set forth by GAAS, but there is no indication that compliance with those standards would have required disclosure in this case.

reason to think that indiscriminate disclosure was unlikely." MIT, 129 F.3d at 683. The First Circuit assumed, without deciding, that the documents were protected work product, but held that the documents had to be produced in response to an IRS summons because disclosure had been made to the DCAA, "a potential adversary." Id. at 687.

The difference between this case and MIT is that, in MIT, DOD was MIT's potential litigation adversary and DCAA, as DOD's audit agency, had both an obligation to DOD to determine whether the amounts charged by MIT to DOD were correct, and the authority to sue MIT in order to recover any overcharges. By contrast, in this case, E&Y was a truly independent auditor that had no obligation to the IRS to determine whether Textron's tax return was correct and no authority to challenge the return. In this instance, E&Y was seeking, only, to determine whether the reserve established by Textron to cover the corporation's contingent tax liabilities satisfied the requirements of GAAP. Since E&Y was not a potential Textron adversary or acting on behalf of a potential adversary, and, since E&Y agreed to treat the workpapers as confidential, disclosure to E&Y did not substantially increase the likelihood that the workpapers would be disclosed to the IRS or other potential Textron adversaries. See Merrill Lynch, 229 F.R.D. at 447 (finding no waiver where company shared internal investigative report of executive's theft with independent auditor, and

distinguishing MIT: "The First Circuit, for example, found that the DOD's audit agency was an adversary because it could potentially dispute a billing charge and file suit against MIT, not because of its duty to review MIT's accounts."); see also In re Pfizer Inc. Sec. Litig., 1993 WL 561125 *6 (finding Pfizer's disclosure to an independent auditor not a waiver of work product protection because "[Pfizer's independent auditor] is not reasonably viewed as a conduit to a potential adversary.").

2. Overcoming the Privilege

As already noted, the work product doctrine creates only a qualified privilege that may be overcome by a showing of (1) "substantial need" for the protected documents, and (2) an inability to otherwise obtain the information contained therein or its substantial equivalent without "undue hardship." Fed. R. Civ. P. 26(b)(3).

While establishing that protected documents relate to a legitimate IRS investigation may satisfy the "relevancy" requirement of § 7602, it is insufficient to establish the "substantial need" showing necessary to overcome the work product privilege. See Davis v. Emery Air Freight Corp., 212 F.R.D. 432, 436 (D. Me. 2003) ("the fact that the documents sought might be relevant to [plaintiff's] claims is not enough under Rule 26(b)(3)."). That is especially true in the case of opinion work product, which consists of the "mental impressions, conclusions, opinions or legal theories" of attorneys, where the party seeking

the materials must meet a heightened burden. See Upjohn, 449 U.S. at 401-2 ("a far stronger showing of necessity and unavailability by other means . . . would be necessary to compel disclosure" of attorneys' notes and memoranda regarding oral statements of witnesses which "reveal the attorneys' mental processes in evaluating the communications"); see also Fed. R. Civ. P. 26(b)(3) ("In ordering discovery . . . the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.").

Here, the IRS has failed to carry the burden of demonstrating a "substantial need" for ordinary work product, let alone the heightened burden applicable to Textron's tax accrual workpapers, which constitute opinion work product. While the opinions and conclusions of Textron's counsel and tax advisers might provide the IRS with insight into Textron's negotiating position and/or litigation strategy, they have little bearing on the determination of Textron's tax liability.[5] The determination of any tax owed by Textron must be based on factual information, none of which is contained in the workpapers and all of which is readily available to the IRS through the issuance of IDRs and by other means. The

---

[5]At the evidentiary hearing, the IRS argued that it is entitled to the tax accrual workpapers because the hazards of litigation percentages would assist in determining whether Textron owes a penalty for underpayment of taxes. Since the IRS has not even asserted that Textron owes any further tax, this argument is premature, at best.

opinions of Textron's counsel, either favorable or unfavorable, would have little to do with that determination, and forced disclosure of those opinions would put Textron at an unfair disadvantage in any dispute that might arise with the IRS, just as requiring the IRS to disclose the opinions of its counsel regarding areas of uncertainty in the law or the likely outcome of any litigation with Textron would place the IRS at an unfair disadvantage. See e.g. Delaney, Migdail & Young, Chartered v. IRS, 826 F.2d 124, 127 (D.C. Cir. 1987) (upholding IRS assertion of work product privilege over "IRS memos advis[ing] the agency of the types of legal challenges likely to be mounted against a proposed program, potential defenses available to the agency, and the likely outcome.").

**Conclusion**

For all of the foregoing reasons, the government's petition to enforce the summons is denied.

IT IS SO ORDERED,

Ernest C. Torres
Sr. United States District Judge
Date: 8/28/07